The plaintiff, John R. Hurst, purchased a used GMC pickup truck from the defendant, Tony Moore Imports, Inc. ("the dealership"). Hurst signed a "Buyer's Order" that contained the following "Dispute Resolution Agreement":
 "Buyer acknowledges and agrees that all disputes and controversies of every kind and nature between buyer and Tony Moore . . ., arising out of or in connection with the purchase of this vehicle will be resolved by arbitration in accordance with the procedure set forth on the reverse side of this buyer's order."
After becoming dissatisfied with the vehicle, Hurst sued the dealership and several of its employees, seeking damages based on allegations of fraud and breach of implied warranties. Hurst demanded a jury trial.
The dealership moved to compel Hurst to arbitrate his claims, in accordance with the arbitration agreement he had signed, and to stay any further judicial proceedings pending the completion of the arbitration proceedings. In the same motion, the dealership moved, in the alternative, to dismiss Hurst's action. In support of that motion, Tony Moore, the dealership's president and sole shareholder, submitted the "Buyer's Order" and an affidavit that stated, in pertinent part, as follows:
 "Pursuant to the transaction whereby the said Johnny R. Hurst purchased the motor vehicle as aforesaid, he signed an installment contract to accomplish financing. This installment contract was assigned by Tony Moore Imports, Inc., to First Alabama Bank[1] and the said Johnny R. Hurst became thereby obligated to pay interest and/or finance charges to First Alabama Bank, thereby enhancing the earnings of the said First Alabama Bank. I am informed and believe and upon such information and belief, I assert that First *Page 1251 
Alabama Bank is a corporation with shareholders who reside in the State of Alabama and in other states. Also, pursuant to the aforesaid transaction, an existing indebtedness owed by the aforesaid Johnny R. Hurst to the Redstone Federal Credit Union was discharged by a payment disbursed by Tony Moore Imports, Inc., from the purchase proceeds. Again, I am informed that Redstone Federal Credit Union has members residing in the State of Alabama and other states and, based upon such information and belief, I hereby aver that members of Redstone Federal Credit Union reside in the State of Alabama and other states."
The trial court granted the dealership's motion, stating:
 "Defendants' 'Motion to Compel Arbitration, Motion to Stay, or In the Alternative, Motion to Dismiss' is before the Court. The Court has considered same and finds that the motion is due to be granted pursuant to Allied-Bruce Terminix Companies, Inc. v. Dobson, [513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)]. The Court hereby ORDERS the motion be GRANTED and the case DISMISSED."
Hurst filed a motion to alter, amend, or vacate the order, supported by, among other things, his affidavit, which stated, in pertinent part, as follows:
 "My name is John Robert Hurst. I am 36 years of age and a resident citizen of Cullman County, Alabama.
 "On December 11, 1995, I purchased a used 1992 GMC truck from Tony Moore Imports, Inc., located and doing business in Morgan County, Alabama. I set forth the following facts in regard to the purchase of said vehicle:
 "1. I am an Alabama resident and have lived here for 36 years.
 "2. I am employed at Webb Wheel in Cullman, Alabama, and have been for 3 1/2 years.
 "3. I work inside the plant and have never been out of the state for any work related business.
 "4. The vehicle in question was purchased to carry me to and from work and for personal use inside the State of Alabama.
 "5. My vehicle is not used in interstate commerce."
The trial court denied Hurst's motion, again relying onAllied-Bruce Terminix, supra. Hurst appealed. We affirm.
Under Alabama law, the specific enforcement of a predispute arbitration agreement violates both our statutory law and our public policy, unless federal law preempts them. Lopez v. HomeBuyers Warranty Corp., 670 So.2d 35 (Ala. 1995). The Federal Arbitration Act preempts contrary state law and, thus, renders enforceable a predispute arbitration agreement contained in a contract that "involves" interstate commerce. Jim BurkeAutomotive, Inc. v. Beavers, 674 So.2d 1260 (Ala. 1995), citingAllied-Bruce Terminix, supra. In Allied-Bruce Terminix, the United States Supreme Court rejected the "contemplation of the parties" test that this Court had adopted in Ex parte Warren,548 So.2d 157 (Ala. 1989), cert. denied, Jim Skinner Ford, Inc.v. Warren, 493 U.S. 998, 110 S.Ct. 554, 107 L.Ed.2d 550
(1989).[2] The Supreme Court stated:
 "The Federal Arbitration Act, [9 U.S.C] § 2 ['the FAA'], provides that a
 " 'written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.' 9 U.S.C. § 2 (emphasis added [by the Supreme Court]).
 "The initial interpretive question focuses upon the words 'involving commerce.' These words are broader than the often-found *Page 1252 
words of art 'in commerce.' They therefore cover more than ' "only persons or activities within the flow of interstate commerce." ' [Emphasis added by the Supreme Court.] United States v. American Building Maintenance Industries, 422 U.S. 271, 276, 95 S.Ct. 2150, 2154, 45 L.Ed.2d 177 (1975), quoting Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974) (defining 'in commerce' as related to the 'flow' and defining the 'flow' to include 'the generation of goods and services for interstate markets and their transport and distribution to the consumer'); see also FTC v. Bunte Brothers, Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941). But, how far beyond the flow of commerce does the word 'involving' reach? Is 'involving' the functional equivalent of the word 'affecting'? That phrase — 'affecting commerce' — normally signals a congressional intent to exercise its Commerce Clause powers to the full. See Russell v. United States, 471 U.S. 858, 859, 105 S.Ct. 2455, 2456, 85 L.Ed.2d 829 (1985). . . .
 "After examining the statute's language, background, and structure, we conclude that the word 'involving' is broad and is indeed the functional equivalent of 'affecting.' . . .
". . . .
 ". . . And, we conclude that the word 'involving,' like 'affecting,' signals an intent to exercise Congress' commerce power to the full.
 "Section 2 applies where there is 'a contract evidencing a transaction involving commerce.' 9 U.S.C. § 2 (emphasis added [by the Supreme Court]). The second interpretive question focuses on the [emphasized] words. Does 'evidencing a transaction' mean only that the transaction (that the contract 'evidences') must turn out, in fact, to have involved interstate commerce? [Emphasis in original.] Or, does it mean more?
 "Many years ago, Second Circuit Chief Judge Lumbard said that the phrase meant considerably more. He wrote:
 " 'The significant question . . . is not whether, in carrying out the terms of the contract, the parties did cross state lines, but whether, at the time they entered into it and accepted the arbitration clause, they contemplated substantial interstate activity. Cogent evidence regarding their state of mind at the time would be the terms of the contract, and if it, on its face, evidences interstate traffic . . ., the contract should come within § 2. In addition, evidence as to how the parties expected the contract to be performed and how it was performed is relevant to whether substantial interstate activity was contemplated.' Metro Industrial Painting Corp. v. Terminal Constr. Co., 287 F.2d 382, 387 (C.A.2 1961) (Lumbard, C.J., concurring) (second emphasis added [by the Supreme Court; first and third emphases original]).
 "The Supreme Court of Alabama, and several other courts, have followed this view, known as the 'contemplation of the parties' test. See supra, [513 U.S. at 269-70, 115 S.Ct. at 837].
 "We find the interpretive choice difficult, but for several reasons we conclude that the first interpretation ('commerce in fact') is more faithful to the statute than the second ('contemplation of the parties'). . . .
". . . .
 ". . . [W]e accept the 'commerce in fact' interpretation, reading the [FAA's] language as insisting that the 'transaction' in fact 'involve' interstate commerce, even if the parties did not contemplate an interstate commerce connection."
513 U.S. at 272-82, 115 S.Ct. at 839-43.
The evidence presented by affidavits in the present case indicates that the dealership is an Alabama corporation, with its sole place of business in Alabama; that Hurst is an Alabama resident and that he purchased a used motor vehicle in Alabama for his own personal use; that Hurst financed the purchase through First Alabama Bank; that Redstone Federal Credit Union held a lien on the vehicle Hurst "traded in" to the dealership; and that the indebtedness owed on that trade-in vehicle was satisfied from the proceeds of the transaction. This Court had *Page 1253 
held before Allied-Bruce Terminix that the sale in Alabama of a used motor vehicle manufactured outside Alabama to an Alabama resident who was buying it as a consumer and not for commercial purposes, was not a contract "involving commerce," as that term is used in the FAA, if the seller had its only place of business in Alabama, the vehicle was delivered to the buyer in Alabama, and all obligations arising out of the contract were to be performed in Alabama. See Ex parte Williams,555 So.2d 146 (Ala. 1989), which relied on a similar case, Ex parteWarren, supra. In Ex parte Warren, this Court stated:
 "Alabama employs a two-pronged test to determine whether the FAA applies to a transaction within the state. This standard was announced by Justice Maddox's dissenting opinion in Ex parte Alabama Oxygen Co., 433 So.2d 1158 (Ala. 1983), and was later adopted by this Court [in the same case, on remand from the United States Supreme Court,] at 452 So.2d 860 (Ala. 1984). That standard is that the FAA applies to a contract if: 1) the contract was one involving interstate commerce; and 2) the contract contained an arbitration agreement voluntarily entered into by the parties.
 "It is undisputed that there was an arbitration clause in the contract involved in this case; therefore, the only question is whether the contract was one involving interstate commerce. In discussing the commerce requirement of the FAA, this Court has stated:
 " 'The requirement of the FAA that an arbitration agreement "involve commerce" has been construed very broadly so that the slightest nexus of the agreement with interstate commerce will bring the agreement within the ambit of the FAA.'
 "Ex parte Costa Head (Atrium), Ltd., 486 So.2d 1272, 1275 (Ala. 1986).
 "Although we note that the language quoted from Ex parte Costa Head is very broad, we find, nonetheless, that, under the particular facts of this case, the transaction in question does not involve interstate commerce, as contemplated by the FAA; and, therefore, we hold that the provisions of the federal legislation are not controlling.
 "We hold that the appropriate standard for making this determination is set forth in a special opinion in Metro Industrial Painting Corp. v. Terminal Construction Co., 287 F.2d 382 (2d Cir. 1961), cert. denied, 368 U.S. 817, 82 S.Ct. 31, 7 L.Ed.2d 24 (1961):
 " '[W]hether at the time [the parties] entered into [the contract] and accepted the arbitration clause, they contemplated substantial interstate activity.'
 "287 F.2d at 387 (Lumbard, Chief Judge, concurring) (emphasis original). See, also, Burke County Public Schools Board of Education v. Shaver, 303 N.C. 408, 279 S.E.2d 816, 822 (1981) (applying the Metro Industrial test).
 "Therefore, the standard here applicable is not the 'regulating standard' of 'affecting interstate commerce'; rather the test for determining whether the transaction involves interstate commerce is a distinct standard unique to the application of the FAA. See [Burke County, 303 N.C. at 418,] 279 S.E.2d at 822 (footnote 11) [emphasis original].
 "Applying the FAA standard to the facts of this case, we perforce must conclude that the parties did not contemplate substantial interstate activity. Indeed, the stipulation of fact precludes, beyond any doubt, a finding that any interstate commercial activity would arise from the retail sale of the automobile. [Emphasis omitted.]"
548 So.2d at 159-60.
Ex parte Williams and Ex parte Warren were decided before the United States Supreme Court decided Allied-Bruce Terminix and while this Court was applying the "contemplation of the parties" test. However, in Allied-Bruce Terminix, the Supreme Court made it very clear that the words "involving commerce," as used in § 2 of the FAA, are much broader than the often-found words of art "in commerce" and that they cover activities within the "flow" of interstate commerce as well as activities that merely have an effect on interstate commerce. Citing United *Page 1254 States v. American Building Maintenance Industries,422 U.S. 271, 276, 95 S.Ct. 2150, 2154, 45 L.Ed.2d 177 (1975), quotingGulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195,95 S.Ct. 392, 398, 42 L.Ed.2d 378 (1974), the Court in Allied-BruceTerminix defined "flow" to include "the generation of goods and services for interstate markets and their transport and distribution to the consumer."[3] 513 U.S. at 268,115 S.Ct. at 839. The Court in American Building Maintenance had held:
 "The Government alternatively argues that even if § 7 [of the Clayton Act] applies only to corporations engaged in the flow of interstate commerce, the Benton companies' activities at the time of the acquisition and merger placed them in that flow. To support this contention the Government relies primarily on the fact that the Benton companies performed a substantial portion of their janitorial services for enterprises which were themselves clearly engaged in selling products in interstate and international markets and in providing interstate communication facilities. But simply supplying localized services to a corporation engaged in interstate commerce does not satisfy the 'in commerce' requirement of § 7.
 "To be engaged 'in commerce' within the meaning of § 7, a corporation must itself be directly engaged in the production, distribution, or acquisition of goods or services in interstate commerce. See Gulf Oil Corp. v. Copp Paving Co., 419 U.S., at 195 [95 S.Ct., at 398]. At the time of the acquisition and merger, however, the Benton companies were completely insulated from any direct participation in interstate markets or the interstate flow of goods or services. The firms' activities were limited to providing janitorial services within Southern California to corporations that made wholly independent pricing decisions concerning their own products. Consequently, whether or not their effect on interstate commerce was sufficiently substantial to come within the ambit of the constitutional power of Congress under the Commerce Clause, in providing janitorial services the Benton companies were not themselves 'engaged in commerce' within the meaning of § 7. Cf. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. [219], at 227-235 [68 S.Ct. 996, 1001-1006, 92 L.Ed. 1328 (1948)].
 "Similarly, although the Benton companies used janitorial equipment and supplies manufactured in large part outside of California, they did not purchase them directly from suppliers located in other States. Cf. Foremost Dairies, Inc., 60 F.T.C. [944], at 1068-1069 [(1962)]. Rather, those products were purchased in intrastate transactions from local distributors. Once again, therefore, the Benton companies were separated from direct participation in interstate commerce by the pricing and other marketing decisions of independent intermediaries. By the time the Benton companies purchased their janitorial supplies, the flow of commerce had ceased. See Schechter Corp. v. United States, 295 U.S. [495], at 542-543 [55 S.Ct. 837, 848-849, 79 L.Ed. 1570 (1935)].
 "In short, since the Benton companies did not participate directly in the sale, purchase, or distribution of goods or services in interstate commerce, they were not 'engaged in commerce' within the meaning of § 7 of the Clayton Act. The District Court, therefore, properly concluded that the acquisition and merger in this case were not within the coverage of § 7 of the Clayton Act."
422 U.S. at 283-86, 95 S.Ct. at 2158-59.
Based on Allied-Bruce Terminix and American BuildingMaintenance,[4] we reaffirm *Page 1255 Ex parte Williams and Ex parte Warren to the extent they stand for the proposition that, standing alone, the sale in Alabama of a used motor vehicle to an Alabama resident, where the seller has its only place of business in Alabama, the vehicle is delivered to the buyer in Alabama, and all obligations arising out of the sales contract are to be performed in Alabama, is not a transaction within the "flow" of interstate commerce.
However, the question remains as to whether Hurst's purchase of the vehicle had some effect on interstate commerce. Because the dealership did not file a brief in this Court, we could assume from the content of Moore's affidavit that the trial court may have held (and that the dealership's argument might be) that the transaction in question affected the flow of interstate commerce, at least in part, because the two financial institutions involved (First Alabama Bank and Redstone Federal Credit Union) may have shareholders or members who reside outside Alabama. Assuming, without deciding, that Moore's testimony (that he was "informed" and "believed" that First Alabama Bank and Redstone Federal Credit Union had out-of-state shareholders or members) was admissible for purposes of the dealership's motion, that testimony in no way indicates that Hurst's purchase of the vehicle from the dealership affected the flow of interstate commerce. Stated differently, a purely intrastate transaction, such as the one here, must affect in some way "the generation of goods and services for interstate markets and their transport and distribution to the consumer" (Allied-Bruce Terminix, supra,513 U.S. at 273, 115 S.Ct. at 839), in order for it to "involve" interstate commerce within the meaning of § 2 of the FAA. However, the obvious weakness of the argument that the involvement of First Alabama Bank and Redstone Federal Credit Union brings this case within § 2 of the FAA causes us to believe that this was not the basis upon which the trial court ruled.
In Jim Burke Automotive, Inc. v. Beavers, supra, a post-Allied-Bruce Terminix case, a majority of this Court affirmed the trial court's denial of a motion to compel arbitration of a dispute arising out of the sale of a used motor vehicle. The majority wrote:
 "Jim Burke offered no evidence in the trial court indicating that the contract had any involvement in interstate commerce. However, it argues that an agreement for the sale of an automobile, per se, involves interstate commerce.
 "It affirmatively appears from the record that Jim Burke has raised this argument for the first time on this appeal. There is no indication in the record that in seeking to compel arbitration Jim Burke asserted that it did not have to demonstrate that the contract involved interstate commerce, on the basis that its involvement with interstate commerce should be assumed, or on any other basis. In light of this, and the fact that Jim Burke did not demonstrate in the trial court that the contract involved interstate commerce, we affirm."
674 So.2d at 1261. Based on our review of the record in the present case, we may logically surmise that the trial court understood the issue before it to be whether an agreement for the intrastate sale of a used motor vehicle has an effect on interstate commerce. Thus, the issue the majority would not reach in Jim Burke Automotive, Inc. v. Beavers is ripe for review in the instant case.
The United States Constitution delegates to Congress the power "[t]o regulate commerce with foreign Nations, and among the several states, and with Indian Tribes." U.S. Const., Art. I, § 8, cl. 3. From the outset of constitutional jurisprudence, many questions have been raised concerning the extent to which Congress may regulate commerce. *Page 1256 
Chief Justice John Marshall first addressed this provision of the Constitution in the seminal case of Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824). In that case, the Chief Justice, noting that the Constitution allowed Congress to "regulate commerce . . . among the several states," gave the first interpretation of this constitutional delegation of power, stating:
 "Comprehensive as the word 'among' is, it may very properly be restricted to that commerce which concerns more states than one. . . . The enumeration presupposes something not enumerated; and that something, if we regard the language or the subject of the sentence, must be the exclusively internal commerce of a State."
22 U.S. (9 Wheat.) at 194-95 (emphasis added). Thus, the very first interpretation of Congress's power to regulate interstate commerce held that this power extends to the regulation of commerce "which concerns more states than one."
The contract in this case involved the sale of a used motor vehicle. Congress, exercising its power to regulate interstate commerce, has specifically authorized federal agencies to regulate the sale of used motor vehicles. See Code of Federal Regulations, Title 16, Commercial Practices, Chapter 1, Federal Trade Commission, Subchapter D, Trade Regulation Rules, Part 455, Used Motor Vehicle Regulation Rule. 16 C.F.R. § 455. Therefore, Congress has concluded that the sale of a used motor vehicle involves interstate commerce.
The definition of "interstate commerce" has been greatly extended beyond the original interpretation given by Chief Justice Marshall. Before 1937, the Supreme Court decisions interpreting the Commerce Clause dealt almost entirely with the Commerce Clause as a restriction on state legislation and interpreted the reach of the Commerce Clause in a narrower manner than more recent decisions. See, e.g., A.L.A. SchechterPoultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837,79 L.Ed. 1570 (1935); United States v. E.C. Knight Co.,156 U.S. 1, 15 S.Ct. 249, 39 L.Ed. 325 (1895); Kidd v. Pearson,128 U.S. 1, 9 S.Ct. 6, 32 L.Ed. 346 (1888); Veazie v. Moor, 55 U.S. 568, 14 How. 568, 14 L.Ed. 545 (1853). In 1937, the Court expanded the interpretation of interstate commerce in NLRB v. Jones Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893
(1937), and abandoned the previous distinction that had been made between direct and indirect effects on interstate commerce, so as to expand Congress's regulatory power. See alsoUnited States v. Wrightwood Dairy Co., 315 U.S. 110,62 S.Ct. 523, 86 L.Ed. 726 (1942); United States v. Darby, 312 U.S. 100,61 S.Ct. 451, 85 L.Ed. 609 (1941). The expansive interpretation of interstate commerce reached its zenith in Wickard v.Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), wherein the Supreme Court, stating that growing and harvesting wheat in one's own backyard would affect interstate commerce, gave Congress the power to regulate a minute local activity. InWickard v. Filburn the Court held that the powers of Congress under the Commerce Clause extended to the regulation of the activities of a farmer, Filburn, who had violated the Agricultural Adjustment Act of 1938 by harvesting more wheat than was allowed under the Act. Although Filburn had grown this wheat primarily for his family's own consumption and had harvested only 12 more acres than was allowed by the Act, the Court held that this activity had a sufficient effect on interstate commerce to allow the United States to prosecute him for violating the Act. The Court, in determining that Filburn's activities involved interstate commerce, stated:
 "One of the primary purposes of the Act in question was to increase the market price of wheat and to that end to limit the volume thereof that could affect the market. It can hardly be denied that a factor of such volume and variability as home-consumed wheat would have a substantial influence on price and market conditions. This may arise because being in marketable condition such wheat overhangs the market and if induced by rising prices tends to flow into the market and check price increases. But if we assume that it is never marketed, it supplies a need of the man who grew it which would otherwise be reflected by purchases in the open market. *Page 1257 
Home-grown wheat in this sense competes with wheat in commerce."
Wickard, 317 U.S. at 128, 63 S.Ct. at 91.
Since this zenith, the seemingly infinite reach of Congress' regulatory authority under the Commerce Clause has shortened somewhat. In United States v. Lopez, 514 U.S. 549,115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court noted that the possession of a firearm near a high school did not involve a commercial transaction and it held that such possession did not affect interstate commerce. The Supreme Court recognized the key dilemma posed by our system of federalism — to hold that the possession of a firearm near a school affected interstate commerce would divest states of the right to regulate public and private schools and would vest that power in Congress.[5]514 U.S. at 563-67, 115 S.Ct. at 1632-33. Unwilling to conclude that the Commerce Clause was intended to subject all state authority to federal intervention, the Supreme Court recognized that the concept of interstate commerce does have limits, at least in noncommercial situations. 514 U.S. at 567,115 S.Ct. at 1634. However, we do not view Lopez as signaling a retreat by the Supreme Court from its expansive interpretation of "interstate commerce" in cases clearly involving commercial transactions.[6] The Court's opinions discussing the reach of the Commerce Clause seem to hold that almost any commercial transaction undertaken may "affect" interstate commerce, no matter how slightly, and therefore can be regulated by Congress. See, e.g., Garcia v. San Antonio Metropolitan TransitAuthority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016
(1985); Hodel v. Virginia Surface Mining Reclamation Ass'n,Inc., 452 U.S. 264, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); Perezv. United States, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686
(1971); Katzenbach v. McClung, 379 U.S. 294, 85 S.Ct. 377,13 L.Ed.2d 290 (1964); Heart of Atlanta Motel, Inc. v. UnitedStates, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964). These cases stand for the proposition that if any effect on interstate commerce can be found in a commercial transaction, then the transaction is considered to be one involving interstate commerce.
One of the most striking examples of the Supreme Court's expansive interpretation of Congress's regulatory power under the Commerce Clause in a commercial setting can be found inRussell v. United States, 471 U.S. 858, 105 S.Ct. 2455,85 L.Ed.2d 829 (1985), which was cited in Allied-Bruce Terminix,513 U.S. at 272, 115 S.Ct. at 839, for the proposition that the phrase "affecting commerce" normally "signals a congressional intent to exercise its Commerce Clause powers to the full." InRussell, the defendant was convicted of unlawfully attempting to destroy by fire a two-unit apartment building in Chicago, Illinois, that the defendant owned and rented. The defendant was prosecuted under 18 U.S.C. § 844(i), which provided:
 "Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosion, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned *Page 1258 
for not more than ten years or fined not more than $10,000, or both. . . ."
See 471 U.S. at 859, 105 S.Ct. at 2456.
In affirming the conviction, the Court stated:
 "The legislative history indicates that Congress intended to exercise its full power to protect 'business property.' Moreover, after considering whether the bill as originally introduced would cover bombings of police stations or churches, the bill was revised to eliminate the words 'for business purposes' from the description of covered property. Even after that change, however, the final Report on the bill emphasized the 'very broad' coverage of 'substantially all business property.' In the floor debates on the final bill, although it was recognized that the coverage of the bill was extremely broad, the Committee Chairman, Representative Celler, expressed the opinion that 'the mere bombing of a private home even under this bill would not be covered because of the question whether the Congress would have the authority under the Constitution.' In sum, the legislative history suggests that Congress at least intended to protect all business property, as well as some additional property that might not fit that description, but perhaps not every private home.
 "By its terms, however, the statute only applies to property that is 'used' in an 'activity' that affects commerce. The rental of real estate is unquestionably such an activity. We need not rely on the connection between the market for residential units and 'the interstate movement of people,' to recognize that the local rental of an apartment unit is merely an element of a much broader commercial market in rental properties. The congressional power to regulate the class of activities that constitute the rental market for real estate includes the power to regulate individual activity within that class.
 "Petitioner was renting his apartment building to tenants at the time he attempted to destroy it by fire. The property was therefore being used in an activity affecting commerce within the meaning of § 844(i)."
471 U.S. at 860-62, 105 S.Ct. at 2456-57. (Emphasis added.)
It is apparent from an analysis of the Supreme Court's opinions discussing the favored status of arbitration agreements, see Mastrobuono v. Shearson Lehman Hutton, Inc.,514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995);Shearson/American Express, Inc. v. McMahon, 482 U.S. 220,107 S.Ct. 2332, 96 L.Ed.2d 185 (1987), and the reach of Congress's regulatory power under the Commerce Clause, that that power extends to the regulation of the intrastate sale of a used motor vehicle. Quite obviously, if the intrastate rental of an apartment building is "an element of a much broader commercial market in rental properties," and is, therefore, subject to congressional regulation under the Commerce Clause, then the intrastate sale of a used motor vehicle would constitute an "individual activity" within a broader "class of activities" subject to federal regulation. We hold, therefore, that federal law preempts state law in this case and that the arbitration agreement contained in the "Buyer's Order" is enforceable.
We note Hurst's alternative argument that the trial court erred in dismissing his action, as opposed to staying it pending the completion of the arbitration process. Section 3 of the FAA provides:
 "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration."
Based on an examination of § 3 and federal precedent, we adopt the following interpretation placed on § 3 by the Fifth Circuit Court of Appeals in Alford v. Dean Witter Reynolds, Inc.,975 F.2d 1161, 1164 (5th Cir. 1992): *Page 1259 
 "Finally, Alford argues that the district court's dismissal with prejudice of her claims is contrary to the precise terms of Section 3 of the Federal Arbitration Act. Section 3 provides that when claims are properly referable to arbitration, that upon application of one of the parties, the court shall stay the trial of the action until the arbitration is complete. 9 U.S.C. § 3. As correctly asserted by Alford, a stay is mandatory upon a showing that the opposing party has commenced suit 'upon any issue referable to arbitration under an agreement in writing for such arbitration. . . .' Thus, the court may not deny a stay in such a situation. This rule, however, was not intended to limit dismissal of a case in the proper circumstances. The weight of authority clearly supports dismissal of the case when all of the issues raised in the district court must be submitted to arbitration. Sea-Land Service, Inc. v. Sea-Land of P.R., Inc., 636 F. Supp. 750, 757
(D.Puerto Rico 1986); Sparling v. Hoffman Const. Co., Inc., 864 F.2d 635, 638 (9th Cir. 1988) (expressly holding that 9 U.S.C. § 3 does not preclude dismissal); Hoffman v. Fidelity and Deposit Co. of Maryland, 734 F. Supp. 192, 195
(D.N.J. 1990); Dancu v. Coopers Lybrand, 778 F. Supp. 832, 835 (E.D.Pa. 1991). As stated in Sea-Land:
 " 'Although we understand that plaintiff's motion to compel arbitration must be granted, we do not believe the proper course is to stay the action pending arbitration. Given our ruling that all issues raised in this action are arbitrable and must be submitted to arbitration, retaining jurisdiction and staying the action will serve no purpose. Any post-arbitration remedies sought by the parties will not entail renewed consideration and adjudication of the merits of the controversy but would be circumscribed to a judicial review of the arbitrator's award in the limited manner prescribed by law. See 9 U.S.C. § 9-12. . . .'
 "Sea-Land, 636 F. Supp. at 757. Because it determined that all of Alford's claims were subject to arbitration, the district court acted within its discretion when it dismissed this case with prejudice."
Like the plaintiff's claims in Alford, all of Hurst's state law claims are arbitrable; therefore, the trial court did not abuse its discretion in dismissing them.
For the foregoing reasons, the trial court's order dismissing Hurst's action and compelling him to arbitrate his dispute with the dealership is affirmed.
AFFIRMED.
HOOPER, C.J., and SEE, J., concur.
MADDOX, J., concurs specially.
COOK, J., concurs in the result.
ALMON, SHORES, KENNEDY, and BUTTS, JJ., dissent.
[1] First Alabama Bank is now known as Regions Bank.
[2] This Court has used two approaches in determining whether a contract involves interstate commerce. See Henderson v.Superior Ins. Co., 628 So.2d 365 (Ala. 1993), noting this Court's use of the "slightest nexus" test in Ex parte Costa Head (Atrium) Ltd., 486 So.2d 1272 (Ala. 1986), overruled, Exparte Jones, 628 So.2d 316 (Ala. 1993), and its adoption of the "contemplation of the parties" test in Ex parte Warren.
[3] Section 1 of the FAA defines "commerce" as "commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation."
[4] We note that in Katzenbach v. McClung, 379 U.S. 294,85 S.Ct. 377, 13 L.Ed.2d 290 (1964), the Court held that a Birmingham barbecue restaurant (Ollie's Barbecue) was involved in interstate commerce because, among other things, the establishment bought meat from a local supplier that had procured the meat from outside Alabama. In so holding, the Court stated:
 "Nor are the cases holding that interstate commerce ends when goods come to rest in the State of destination apposite here. That line of cases has been applied with reference to state taxation or regulation but not in a field of federal regulation."
379 U.S. at 302, 85 S.Ct. at 383. Because American BuildingMaintenance involved a federal regulatory act and because it stands for the proposition that the "flow" of interstate commerce ceases once goods come to rest in the state of destination, we are hesitant to place great significance on the holding in Katzenbach, at least with respect to the issue whether Hurst's purchase of the vehicle was within the flow of interstate commerce.
[5] To emphasize the constitutional significance of the balance of power between the federal government and the states, the Supreme Court quoted James Madison:
 "[T]he powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite."
Lopez, 514 U.S. at 551, 115 S.Ct. at 1626 (quoting TheFederalist No. 45, at 292-93) (Clinton Rossiter ed., 1961). The Supreme Court held that Congress's enumerated commerce power did not extend to the regulation of public and private schools.514 U.S. at 565, 115 S.Ct. at 1633.
[6] The Court in Lopez noted:
 "To uphold the Government's contentions here, we would have to pile inference upon inference in a manner that would bid fair to convert congressional authority under the Commerce Clause to a general police power of the sort retained by the States. Admittedly, some of our prior cases have taken long steps down that road, giving great deference to congressional action. . . . The broad language in these opinions has suggested the possibility of additional expansion, but we decline here to proceed any further."
514 U.S. at 567, 115 S.Ct. at 1634. (Emphasis added.)