826 So.2d 122 (2002)
JIM BURKE AUTOMOTIVE, INC., et al.
v.
Lori McGRUE.
Roebuck Honda et al.
v.
Lori McGrue.
Century Chevrolet-Geo, Inc., et al.
v.
Lori McGrue.
Hoover Toyota, L.L.C.
v.
Lori McGrue.
Serra Toyota, Inc., et al.
v.
Lori McGrue.
Courtesy Pontiac GMC, Inc.
v.
Lori McGrue.
1000831, 1000877, 1000972, 1000973, 1000980 and 1000981.
Supreme Court of Alabama.
January 18, 2002.
*124 John Martin Galese, Jeffrey L. Ingram, and David A. Norris of Galese & Ingram, P.C., Birmingham, for appellants Jim Burke Automotive, Inc.; Roebuck Mazda; Med-Center Mazda; Crown Pontiac-Nissan; Crown Automobile Company; King Acura; Limbaugh Toyota; Susan Schein Chevrolet; Premiere Chevrolet; Neil Bonnett Honda; Lynn Layton Chevrolet; Jim Skinner Ford; and Edwards Chevrolet.
Jeffrey E. Friedman, P. Thomas Dazzio, Jr., and Jess S. Boone of Friedman, Leak & Bloom, P.C., Birmingham, for appellants Roebuck Chrysler-Plymouth-Jeep-Eagle, Inc.; Roebuck Honda; and Tameron Automotive Group.
Thomas S. Spires and Matthew C. Williams of Smith, Spires & Peddy, P.C., Birmingham, for appellants Century Chevrolet-Geo, Inc.; Royal Oldsmobile Company, Inc.; and Steel City Pontiac-GMC.
Cecil H. Macoy and Larry S. Logsdon of Wallace, Jordan, Ratliff & Brandt, L.L.C., Birmingham, for appellant Hoover Toyota, L.L.C.
Paul C. Garrison of Hall, Conerly, Mudd & Bolvig, P.C., Birmingham, for appellant Serra Toyota, Inc.
Jack J. Hall, Jr., of Hall, Conerly, Mudd & Bolvig, P.C., Birmingham, for appellant Courtesy Pontiac GMC, Inc.
Robert H. Ford of The Ford Law Firm, Birmingham; and William M. Dawson, Birmingham, for appellee.
Robert A. Huffaker of Rushton, Stakely, Johnston & Garrett, P.A., Montgomery, for amicus curiae Automobile Dealers Association of Alabama, in support of the application for rehearing.
Kallie C. Lunsford and Michael L. Jones of Galese & Ingram, P.C., Birmingham, for amicus curiae Alabama Independent Automobile Dealers Association, in support of the application for rehearing

On Applications for Rehearing
HOUSTON, Justice.
The opinion of October 5, 2001, is withdrawn and the following is substituted therefor.
Lori McGrue sued Jim Burke Automotive, Inc. (an automobile dealership hereinafter referred to as "Jim Burke"), and Roebuck Mazda; Med-Center Mazda; Crown Pontiac-Nissan, Inc.; Crown Automobile Company, Inc.; King Acura; Limbaugh Toyota; Susan Schein Chevrolet, Inc.; Premier Chevrolet, Inc.; Neil Bonnett Honda; Lynn Layton Chevrolet Company; Jim Skinner Ford; Edwards Chevrolet Company, Inc.; Roebuck Chrysler-Plymouth-Jeep-Eagle, Inc.; Roebuck Honda; Tameron Automotive Group; Hoover Toyota, L.L.C.; Courtesy Pontiac GMC, Inc.; Century Chevrolet-Geo, Inc.; Royal Oldsmobile Company, Inc.; Steel City Pontiac-GMC; and Serra Toyota, Inc. (automobile dealerships hereinafter referred to as "the nonsignatory defendants"). The plaintiff sought damages based on allegations of conspiracy, violations of her constitutional right to a trial by jury, and antitrust violations. She also *125 requested certification of her case as a class action.[1] Jim Burke and the nonsignatory defendants filed motions to compel McGrue to arbitrate her claims citing three arbitration agreements executed by her and Jim Burke. The trial court denied the motions. Jim Burke and the nonsignatory defendants appeal, in six separate appeals. We reverse the trial court's order denying Jim Burke's motion to compel arbitration, but we affirm the orders denying the nonsignatory defendants' motions to compel arbitration, and we remand.

I.
Lori McGrue purchased a used Nissan Altima automobile from Jim Burke. McGrue and a representative of Jim Burke executed three documents in connection with this purchase: a single-page arbitration agreement, a retail installment contract that contained an arbitration agreement; and an extended-service contract that also contained an arbitration agreement. Shortly after McGrue purchased the vehicle, she learned that it had been wrecked before she purchased it. McGrue complained to Jim Burke about the condition of her vehicle. Jim Burke offered to replace it with another vehicle if McGrue would execute another arbitration agreement. McGrue refused to sign the additional agreement and ultimately did not trade in her vehicle with Jim Burke. McGrue subsequently approached each of the nonsignatory defendants, inquiring about making a trade as to the vehicle. Similarly, the nonsignatory defendants informed her that to deal with her they would require that she execute an arbitration agreement as a condition of the trade. She would not sign an arbitration agreement and did not enter, with any nonsignatory defendant, a transaction involving the vehicle.
Approximately four months after she had purchased the car, McGrue filed this action against Jim Burke and the nonsignatory defendants. In her complaint, McGrue alleged that by their conduct the defendants had violated "her constitutional rights under ... the Alabama Constitution," that the defendants had "engaged in and continue to engage in an illegal civil conspiracy by contriving, combining, federating and conspiring amongst themselves" to violate her rights, and that the defendants had engaged in an "unlawful trust, combine or monopoly." McGrue's complaint included the following paragraph:
"WHEREFORE, Plaintiff demands judgment for compensatory and punitive damages and statutory penalties of Five Hundred Dollars ($500.00) for herself and each plaintiff similarly situated; to-wit: Fifty Thousand Dollars ($50,000.00) for herself and approximately Five Hundred Million Dollars ($500,000,000.00) for the members of the class which is estimated at 10,000 members."
(R. 3.)
In response to McGrue's complaint, Jim Burke and the nonsignatory defendants filed motions to enforce the arbitration *126 agreements signed by McGrue and representatives of Jim Burke. In support of its motion, Jim Burke offered the affidavit of Dave Bolden, the comptroller of Jim Burke, in which he states:
"[Jim Burke] sought to obtain financing for Ms. McGrue's purchase through multiple out of state finance companies. Eventually, she financed her purchase through Chrysler Financial Company, L.L.C., a Michigan corporation.
". . . .
"The automobile purchased by Ms. McGrue, as described [on the financing documents,] was manufactured outside of Alabama and received by [Jim Burke] in Alabama. After manufacture, the car was sold to Southwest Tex Leasing Company, a San Antonio, Texas company. At the time of Southwest Tex Leasing Company's purchase, the car was financed by Ford Motor Credit Company, a Delaware corporation. The car was then purchased by American Sales & Leasing, of Orlando, Florida. [Jim Burke] purchase[d] the car from American Sales & Leasing, prior to its sale to Ms. McGrue. From the time of manufacture to its sale to Southwest Tex Leasing Company, its resale to American Sales & Leasing, its subsequent resale to [Jim Burke] in Orlando, Florida, and final sale to Ms. McGrue in Alabama, the car had traveled extensively in interstate commerce, with sales and resales occurring in multiple states."
(R. 42-45.)
Jim Burke later submitted, as evidence in support of its motion to compel arbitration, a transcription of McGrue's execution of the arbitration agreements; during her execution of the agreements, McGrue asked no questions about them, and they were fully disclosed to her, without misrepresentation.
McGrue submitted the following affidavit with her response to the motions to enforce the arbitration agreements:
"My name is Lori McGrue. I am the plaintiff in the above case. I purchased a Nissan Altima from [Jim Burke] on April 19, 2000. Soon thereafter, I discovered that the car had been wrecked before I bought it and I took it back to [Jim Burke]. They offered me a deal that included replacing the automobile with another[,] but they insisted that I sign an arbitration agreement as a condition of the sale. I refused to sign it. Later, I tried to trade with all of the [nonsignatory defendants] and all of them refused to trade unless I signed an arbitration agreement.
"My lawsuit makes no claim respecting the original purchase of the once wrecked Nissan Altima on April 19, 2000. I may decide to bring an arbitration proceeding to recover damages related to the original purchase from [Jim Burke], however, because the filing fees and other expenses are very high, I will need to save some money to do this. My lawsuit claims damages, injunctive relief and class action status because all of the defendants have conspired to deny my constitutional right to a trial by jury in civil actions at law. This is an illegal conspiracy and it constitutes an illegal boycott and restraint of trade.
"Although I did sign an arbitration agreement respecting my purchase of the Nissan Altima from [Jim Burke], this agreement should not extend to my claims regarding my attempt to purchase a replacement vehicle without having to submit to a binding arbitration agreement. Certainly, I have never signed any agreements with the [nonsignatory defendants], who likewise, uniformly refused to trade with me unless I agreed to arbitration.

*127 "I believe I have a constitutional right to a jury trial in this case. I am over the age of nineteen, of sound mind, and competent to give evidence in this case. I have personal knowledge of the matters stated herein."
(R. 233-34.)
After conducting a hearing on the motions by Jim Burke and the nonsignatory defendants to enforce the arbitration agreements, the trial court entered the following order:
"Plaintiff brings this action for damages and injunctive relief against twenty-two Birmingham automobile dealers. She makes the claim on her own behalf and seeks class certification to represent all other customers who have bought motor vehicles from the defendants within the two years prior to the filing of the complaint. Plaintiff asserts two causes of action. She alleges that the defendants engaged in an illegal civil conspiracy to deprive the plaintiffs of their legal rights. She also alleges that the defendants have violated [Ala.Code 1975, § 6-5-60,] by engaging in an unlawful trust, combine or monopoly. Defendants deny liability.
"The parties have agreed in open court that there is no disputed issue of material fact on the issue of whether there is a binding arbitration agreement to resolve the issues raised in the plaintiff's complaint. Upon consideration, the court finds that there was no agreement to arbitrate the issue in this case and, therefore, the motion to compel binding arbitration is due to be and is hereby DENIED."
(Emphasis added.)
The retail installment contract McGrue executed when she purchased the Nissan Altima, which she tried to trade in to Jim Burke, and then to the nonsignatory defendants, on another vehicle, provided, in pertinent part:
"Any claim or dispute, whether in contract, tort or otherwise (including the interpretation and scope of this clause and the arbitrability of any issue), between you and us or our employees, agents, successors or assigns, which arise out of or relate to this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election (or the election of any such third party), be resolved by a neutral, binding arbitration and not by a court action."
The single-page arbitration agreement entered into by Jim Burke and McGrue provided, in pertinent part:
"The undersigned agree that all disputes not barred by applicable statutes of limitations, ... denominated as a claim ..., resulting from or arising out of or relating to or concerning the transaction entered into (including but not limited to: the terms of this agreement and all clauses herein contained, their breadth and scope and any term of any agreement contemporaneously entered into by the parties concerning any goods or services acquired by the undersigned; the past, present and future condition of the motor vehicle; the conformity of the motor vehicle to any contract description; the representations, promises, undertakings, warranties or covenants made by [Jim Burke] in connection with the undersigned's acquisition of the motor vehicle ...) shall be submitted to BINDING ARBITRATION...."
(Emphasis added.)
The extended-service contract that Jim Burke and McGrue executed reads, in pertinent part:

*128 "ALTERNATIVE DISPUTE RESOLUTION CLAUSE: THE PARTIES TO THIS CONTRACT HEREBY EXPRESS THAT ALL DISPUTES, CONTROVERSIES OR CLAIMS OF ANY KIND AND NATURE BETWEEN THE PARTIES HERETO, ARISING OUT OF OR IN ANY WAY RELATED TO THE WITHIN CONTRACT, ITS INTERPRETATION, PERFORMANCE OR BREACH, SHALL BE RESOLVED EXCLUSIVELY BY THE FOLLOWING ALTERNATIVE DISPUTE RESOLUTION MECHANISMS, WHICH IS [SIC] FINAL AND BINDING."
The "alternative dispute resolution mechanisms" available under that clause are negotiations, mediation, and arbitration.
In the context of arbitration, this Court has held that "`two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract and should be read together.'" Quality Truck & Auto Sales, Inc. v. Yassine, 730 So.2d 1164, 1170 n. 8 (Ala.1999)(quoting with approval Haddox v. First Alabama Bank of Montgomery, N.A., 449 So.2d 1226, 1229 (Ala.1984)). Thus, for the purposes of this analysis, the phrase "the agreement" refers to all three documents in their entirety.

II.
These appeals present the following issues: (1) Is the arbitration agreement subject to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq.? (2) If so, is it enforceable against the nonsignatory defendants? and (3) Did the trial court err when it held that the claims against Jim Burke were not subject to arbitration specifically whether it erred in holding that the question of the arbitrability of the claims against Jim Burke was itself not subject to arbitration.
A direct appeal is the appropriate procedure by which to seek review of a trial court's order denying a motion to compel arbitration. Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 745 (Ala.2000).[2] This Court reviews de novo the trial court's denial of the motion to compel arbitration. Patrick Home Ctr., Inc. v. Karr, 730 So.2d 1171, 1171 (Ala. 1999).

III. Issue 1
We first address the question whether the FAA applies to the arbitration agreement McGrue signed when she purchased the used motor vehicle from Jim Burke. Section 8-1-41(3), Ala.Code 1975, prohibits specific enforcement of "[a]n agreement to submit a controversy to arbitration." However, § 2 of the FAA, 9 U.S.C. § 2, provides:
"A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
This Court has recognized that under this section the FAA preempts conflicting state law where an arbitration agreement is contained in a contract that "evidenc[es] a transaction involving [interstate] commerce." Ex parte Jones, 628 So.2d 316 (Ala.1993); Ex parte Phelps, 672 So.2d 790 (Ala.1995); see Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, *129 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Thus, an arbitration provision contained in a contract that, in fact, evidences a transaction involving interstate commerce is put "`on the same footing' as other terms of a contract." Phelps, 672 So.2d at 793 (quoting Allied-Bruce Terminix, 513 U.S. at 275, 115 S.Ct. 834).
We note that nothing in the record suggests, and that McGrue does not contend, that the arbitration agreement she entered with Jim Burke is invalid. Therefore, the FAA will apply to that arbitration agreement if it appears in a contract evidencing a transaction "involving interstate commerce in fact, so as to be within Congress's power to regulate under the Commerce Clause." Coastal Ford, Inc. v. Kidder, 694 So.2d 1285, 1287 (Ala.1997). The burden of proving that the transaction at issue in this case substantially affected interstate commerce is on Jim Burke and the nonsignatory defendants, because they seek to compel arbitration. See TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999).
In Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249 (Ala.1997), a plurality of this Court (four Justices) concluded that the sale of a used motor vehicle is, per se, a transaction involving interstate commerce and, thus, triggers application of the FAA. However, in Southern United Fire Insurance Co. v. Knight, 736 So.2d 582 (Ala.1999), this Court declined to adopt that proposition as a per se rule for determining whether the purchase of a used motor vehicle is a transaction involving interstate commerce. Instead, in Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000), this Court listed factors a court should consider when determining if a transaction has had a "substantial effect" on interstate commerce. These factors are: (1) the citizenship of the parties and any affiliation they have with out-of-state entities; (2) tools and equipment used in performance of the contract; (3) allocation of the contract price to cost of services and to cost of materials involved in performance of the contract; (4) subsequent movement of the object of the contract across state lines; and (5) the degree to which the contract at issue was separable from other contracts that are subject to the FAA. Id. at 765-66.
Relying primarily on David Bolden's affidavit, quoted above, we conclude that Jim Burke and the nonsignatory defendants met their burden imposed by this Court's listing of the several factors in Sisters of the Visitation. Admittedly, the sale and purchase of the used vehicle in this case occurred in Alabama and occurred between two Alabama residents. (The record does not indicate that Jim Burke is affiliated with a national network of automobile dealerships. Cf. Allied-Bruce Terminix, supra.) Bolden's affidavit states that Southwest Tex Leasing Company, a company located in San Antonio, Texas, purchased the vehicle from the manufacturer.[3] Southwest Tex then sold the vehicle to American Sales & Leasing, a company located in Orlando, Florida. Finally, Jim Burke bought the vehicle in Florida, from American Sales & Leasing, and subsequently sold the vehicle to McGrue in Alabama. The financing of the purchases involving this vehicle involved two out-of-state financial corporations: Ford Motor Credit Company of Delaware financed the sale to Southwest Tex, and Chrysler Financial Company, L.L.C., a *130 Michigan corporation, financed McGrue's purchase of the vehicle.
We contrast this case with Tefco Finance Co. v. Green, 793 So.2d 755 (Ala. 2001). Tefco involved the sale of a used motor vehicle by an Alabama automobile dealership to an Alabama resident, with an Alabama corporation financing the transaction. Id. at 756. The dealership and the financial institution, as defendants, moved to compel arbitration and to transfer the case to another county; to their motion they attached an affidavit in which the vice president of the dealership, also acting as vice president of the financial institution, stated that all the business in the transaction at issue had occurred exclusively in a particular county in Alabama. Id. This Court held that the arbitration agreement was unenforceable because the defendants had failed to prove the impact of the transaction on interstate commerce. Id. In this case, we have an affidavit that clearly describes the interstate activities of the transaction.
Thus, we hold that the purchase of this vehicle substantially affected interstate commerce and that the FAA does apply to make the arbitration agreement in this case enforceable.

IV. Issue 2
The nonsignatory defendants argue that the arbitration agreement between McGrue and Jim Burke entitled them to compel arbitration of McGrue's claims against them. What this Court wrote in Ex parte Stamey, 776 So.2d 85, 89-90 (Ala. 2000), explains why the nonsignatories' argument is unpersuasive:
"In most of the cases that have come before this Court on an equitable-estoppel claim, we have not allowed the claims to be arbitrated, because the language of the arbitration provisions limited arbitration to the signing parties, so that there had been no assent on the part of the resisting party to arbitrate claims against nonsignatories. In other words, within these arbitration provisions references to the parties specifically limited the claims that would be arbitrable under those provisions. For example, the arbitration agreement at issue in Med Center Cars[, Inc. v. Smith, 727 So.2d 9, 13 (Ala.1998),] read:
"`BUYER HEREBY ACKNOWLEDGES AND AGREES THAT ALL DISPUTES AND CONTROVERSIES OF EVERY KIND AND NATURE BETWEEN BUYER AND SELLER ARISING OUT OF OR IN CONNECTION WITH THE PURCHASE OF THIS VEHICLE WILL BE RESOLVED BY ARBITRATION WITH THE PROCEDURE SET FORTH ON THE REVERSE SIDE OF THIS BUYER'S ORDER.'

Med Center Cars, 727 So.2d at 13. (Emphasis added [in Stamey].) This Court wrote:
"`The language of the arbitration clauses in this case [is] not broad enough to encompass claims against the nonsignatories. The written arbitration agreements in this case expressly limit the scope of the agreements to "disputes, claims, and controversies" arising between the "Buyer" and the "Seller" only. ... Therefore, the nonsignatories have no standing to seek enforcement of those arbitration agreements.'

Id. at 19. Because the agreement in Med Center Cars limited the claims that might be submitted to arbitration to those between the `buyer' and the `seller,' the buyer, who was resisting arbitration, could not be found to have assented to have his claims against a nonparty lender submitted to arbitration. Med Center Cars applied the rule that if the arbitration provision is specifically limited *131 to claims that arise between the parties to the contract, then any nonparties will not be able to enforce the arbitration agreement."
(Some citations omitted; capitalization in original.) See Parkway Dodge, Inc. v. Yarbrough, 779 So.2d 1205, 1209 (Ala. 2000), quoting Ex parte Stamey.
The three arbitration documents contain language that limits the applicability of the agreement to Jim Burke. The single-page arbitration agreement and the extended-service contract apply to "the parties" to the agreement, while the arbitration provision in the installment contract refers to "[a]ny claim or dispute ... between you and us or our employees, agents, successors or assigns." Clearly, the arbitration agreements are limited to the signing parties, namely McGrue, as the purchaser, and Jim Burke, as the dealer. The language of the arbitration agreement is not broad enough to reach the nonsignatory defendants. Therefore, based upon the terms of the arbitration agreement between McGrue and Jim Burke, we conclude that the nonsignatory defendants are not entitled to compel arbitration. Thus, the trial court properly denied the nonsignatory defendants' motions to compel arbitration.
In Southern Energy Homes, Inc. v. Gary, 774 So.2d 521 (Ala.2000), Blue Ribbon and Gary had entered into three contracts, each containing an arbitration provision; the arbitration provisions were clearly and specifically limited to disputes between those two parties. Id. at 523-25. In that case, we held:
"Even though the arbitration clauses discussed above are not broad enough to encompass Gary's claims against Southern Energy, we conclude that Gary's claims against Blue Ribbon, a signatory, and those against Southern Energy, a nonsignatory, are sufficiently intertwined that all claims must be arbitrated....
". . . .
"Unlike the general conspiracy allegations in Med Center Cars [v. Smith, 727 So.2d 9 (Ala.1998)], which did not identify a specific defendant who was subject to arbitration and who was alleged to have been involved in the conspiracy, and in which there were some defendants who were not subject to arbitration, the counterclaim in this case makes specific allegations of conspiracy against Blue Ribbon, an entity clearly subject to arbitration, in addition to the allegations against Southern Energy.... [W]e conclude that Gary's claims against Southern Energy are closely intertwined with the claims against Blue Ribbon, a party that is subject to arbitration, and that the connection is sufficient to subject all of the claims against Southern Energy to arbitration."
Id. at 527-28.
To the extent that the above holding in Southern Energy Homes v. Gary, supra, conflicts with our holding in this case at issue, that holding is overruled.

V. Issue 3
Jim Burke and the nonsignatory defendants argue in their briefs on appeal that the trial court erred when it determined that the arbitration agreement was not broad enough to cover the claims asserted in McGrue's complaint ("the court finds that there was no agreement to arbitrate the issue in this case"). Specifically, they contend that the three documents constituting the arbitration agreement require that the breadth of the agreement be determined by the arbitrator.
We note, as explained above, that the nonsignatory defendants are not eligible to compel arbitration under the agreement. Thus, they are not entitled to have the *132 issue of the arbitrability of McGrue's claims against them decided by an arbitrator pursuant to the agreement at issue in this case. Therefore, our analysis on this issue focuses solely on whether the trial court appropriately decided the question of arbitrability with respect to the claims against Jim Burke.
The single-page arbitration agreement provides that the arbitrator decides "the terms of this agreement and all clauses herein contained, their breadth and scope." The installment contract states that any dispute, including "the interpretation and scope of this clause and the arbitrability of any issue" is to be resolved by arbitration. The extended-service contract states that all disputes relating to the interpretation of the contract are to be determined by the arbitrator.
This Court has, pursuant to Patrick Homes, supra, reviewed de novo the trial court's denial of Jim Burke's motion to compel arbitration, and concludes that the trial court erred when it held that McGrue's claims against Jim Burke were not arbitrable. A trial court should not order arbitration of the issue of arbitrability except upon "`clea[r] and unmistakabl[e]' evidence" that the parties agreed to arbitrate that issue. Commercial Credit Corp. v. Leggett, 744 So.2d 890, 892 (Ala.1999)(quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)). This record contains such evidence.
The plain language of the arbitration agreement, quoted above, indicates that McGrue and Jim Burke intended to arbitrate the issue of arbitrability. This Court, in Homes of Legend, Inc. v. McCollough, supra, 776 So.2d at 746, explained the general Alabama rules of contract interpretation:
"[T]he intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning."
Id. at 745 (citation omitted). The language of the arbitration agreement is clear and unmistakable evidence indicating that McGrue and Jim Burke intended to arbitrate the question of arbitrability (i.e., the scope, the interpretation, and the application of the agreement) of any disputes that arose from their relationship. Thus, the trial court erred when it decided the question of the arbitrability of McGrue's claims against Jim Burke, because that issue should have been determined by an arbitrator.
Jim Burke further argues that the trial court erred when it denied Jim Burke's motion to compel arbitration because, it argues, the language of the arbitration agreement is sufficiently broad in scope to include McGrue's claims against Jim Burke. Because we hold that the trial court improperly decided the question of the arbitrability of McGrue's claims against Jim Burke, we must also hold that the issue whether those claims come within the agreement is not before us. That question is within the province of the arbitrator. Thus, we remand the case and direct the trial court to grant Jim Burke's motion to compel arbitration as to the arbitrability of McGrue's claims against Jim Burke.

VI. Conclusion
The trial court's order denying the motions to compel arbitration is reversed insofar as it relates to Jim Burke. However, insofar as it relates to the nonsignatory defendants, it is affirmed. The case is remanded.
*133 OPINION OF OCTOBER 5, 2001, WITHDRAWN; OPINION SUBSTITUTED; APPLICATIONS OVERRULED.
1000877, 1000972, 1000973, 1000980, 1000981AFFIRMED.
1000831REVERSED AND REMANDED.
LYONS, BROWN, WOODALL, and STUART, JJ., concur.
SEE and HARWOOD, JJ., concur in the result as to Part III, and concur otherwise.
JOHNSTONE, J., concurs in part, concurs in the result in part, and dissents in part.
MOORE, C.J., concurs in the result in part and dissents in part.
SEE, Justice (concurring in the result as to Part III, and concurring otherwise).
I concur in Parts I, II, IV, V, and VI of the majority opinion. I concur only in the result in Part III of the majority opinion, however, because of the majority's reliance in that part of the opinion on Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759, 782 (Ala.2000), a case in which I dissented.
HARWOOD, Justice (concurring in the result as to Part III, and concurring otherwise).
I concur in the result reached in Part III of the main opinion whereby the depositive determination was made that "the purchase of this vehicle substantially affected interstate commerce." 826 So.2d at 130. However, that section of the opinion expressly states that it is "[r]elying primarily on David Bolden's affidavit," 826 So.2d at 129, and that, by virtue of the content of that affidavit, "we have an affidavit that clearly describes the interstate activities of the transaction." 826 So.2d at 130. Considering only the "four corners" of the portions of that affidavit set forth in the opinion, I disagree. Those portions detail a series of separate and unrelated events and transactionsthe 1999 Nissan Altima automobile involved in this case was originally manufactured outside the State of Alabama; it was sold at some point thereafter to Southwest Tex Leasing Company of San Antonio, Texas, which financed the acquisition through Ford Motor Credit Company, a Delaware corporation; it was then sold by Southwest Tex to American Sales & Leasing of Orlando, Florida; and it was finally sold by American Leasing to Jim Burke Automotive, Inc., located in Birmingham, Alabama. Thereafter, on April 19, 2000, Ms. McGrue purchased the car from Jim Burke. She financed the purchase through Chrysler Financial Company, L.L.C., a Michigan corporation. I consider all of the transactions that preceded "the" transaction between Jim Burke and Ms. McGrue to be extraneous to a proper analysis of whether "the" transaction substantially affected interstate commerce. Those earlier sales and purchases do not represent a seamless continuum of interrelated transactions, but are disconnected events, associated only because of the fortuity of their sequence.
However, I do find within the remainder of Mr. Bolden's affidavit, as it appears in the record, sufficient additional evidence to warrant the conclusion that "the" transaction did in fact substantially affect interstate commerce. The only feature of the portions of Mr. Bolden's affidavit set out in Part III of the main opinion that I consider to be relevant to our "substantial-effect" analysis is the fact that Ms. McGrue financed her purchase through Chrysler Financial Company, L.L.C., a Michigan corporation. The Bolden affidavit also states (and Jim Burke in its brief argues persuasively the significance of this fact) that before completing the transaction with Ms. *134 McGrue, and with her consent, Jim Burke obtained credit reports from Equifax and TransUnion, credit-reporting agencies located outside Alabama. Jim Burke also obtained credit references on Ms. McGrue from creditors located outside Alabama, and those references were considered in the process of approving Ms. McGrue for credit financing of the transaction. Before finally arranging for the financing of the transaction with Chrysler Financial Company, Jim Burke had sought to obtain financing for Ms. McGrue from a number of other out-of-state finance companies. As a part of her purchase, Ms. McGrue obtained an extended-service agreement from MS Dealer Service Corporation, a Mississippi corporation. The retail installment contract Ms. McGrue signed was provided by Chrysler Financial. Jim Burke was not authorized to alter any of the printed terms of either the retail installment contract or the extended-service agreement. Both of those documents contained arbitration agreements. Ms. McGrue also executed a single-page arbitration agreement with Jim Burke, which stated in part that the parties
"mutually covenant, stipulate and agree... [t]hat the vehicle described below was manufactured outside of Alabama or from parts traveling in interstate commerce; has operated in and will continue to operate on interstate highways; has been traveling in interstate commerce; the manufacture, transportation, sale and use thereof has been and will continue to be regulated by laws of the United States of America; and that the contract(s) and agreements entered into by the parties concerning said motor vehicle evidence transactions involving and affecting interstate commerce."
I deem the cumulative effect of all of these additional features of "the" transaction to be sufficient to support the conclusion of the main opinion that "the purchase of this vehicle substantially affected interstate commerce." Additionally, although the brief filed on behalf of Jim Burke and certain of the nonsignatory defendants devotes several pages to a discussion of the effect of the transaction on interstate commerce, Ms. McGrue takes no note of any of that in her brief, being content simply to argue that the claims she is asserting "have absolutely nothing to do with the sale transaction of April 19, 2000, except that the sale prompted the plaintiff to go shopping for another car that was not wrecked and that would not require her to give up her constitutional right to a trial by jury in civil cases," and to assert that "[t]he trial court correctly recognized that the plaintiff's claims had nothing to do with a sales transaction between the plaintiff and one of the defendants, Jim Burke Automotive, Inc." In her affidavit, set out in Part I of the main opinion, she implicitly recognizes the enforceability of the arbitration clauses involved in her transaction, because she states: "My lawsuit makes no claim respecting the original purchase of the once wrecked Nissan Altima on August 19, 2000. I may decide to bring an arbitration proceeding to recover damages related to the original purchase ...." Consequently, after factoring in all of these considerations, I concur in the result in Part III of the main opinion.
Except as to Part III, I fully concur.
JOHNSTONE, Justice (concurring in part, concurring in the result in part, and dissenting in part).
I would affirm the trial court in its denial of the motions to compel arbitration in all six cases. Therefore, I respectfully dissent in case no. 1000831, Jim Burke Automotive, Inc. v. Lori McGrue; and I concur in part and concur in the result in part in the other five cases.
*135 My primary reason for dissenting in the appeal by the signatory Jim Burke Automotive is that McGrue's purchase of the car from Jim Burke was not a transaction that substantially affected interstate commerce as required for the Federal Arbitration Act to apply. McGrue was an Alabama buyer, Jim Burke was an Alabama seller, and the car was part of Jim Burke's Alabama inventory, where it had come to rest after its interstate peregrinations. The car was no longer in interstate commerce when McGrue bought it. See A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 543, 55 S.Ct. 837, 79 L.Ed. 1570 (1935); and Ex parte Kampis, 826 So.2d 819 (Ala.2002). The financing agreements were separate transactions which did not impart any substantial interstate feature to the sale and purchase between Jim Burke and McGrue.
But for one exception, I concur in the main opinion in affirming the trial court in its denial of the motions to compel arbitration in cases nos. 1000877, 1000972, 1000973, 1000980, and 1000981. The exception would not change the result in any of these five cases.
The exception is that, in my opinion, the five nonsignatory defendants, like the signatory Jim Burke, have failed to establish any contract or transaction substantially affecting interstate commerce. As I have already explained, McGrue's agreements with the signatory Jim Burke did not substantially affect interstate commerce; and the five nonsignatory defendants did not enter any contract or transaction with McGrue at all.
MOORE, Chief Justice (concurring in the result in part and dissenting in part).
The nonsignatory defendants are not entitled to compel arbitration of McGrue's claims and are not entitled to have the issue of arbitrability decided by an arbitrator. Therefore, as to case no. 1000877, case no. 1000972, case no. 1000973, case no. 1000980, and case no. 1000981, I concur in the result. As to case no. 1000831 (the appeal by Jim Burke Automotive, Inc.), I dissent.
NOTES
[1] McGrue sought certification of a class of "all consumers who have bought cars from [Jim Burke and the nonsignatory defendants] in the last two years, all of whom were required to sign a BINDING ARBITRATION AGREEMENT in violation of the laws against contracts of adhesion and in abrogation of their constitutional rights to trial by jury in civil actions at law." (Emphasis added; capitalization in original.) McGrue further averred that at least some of the questions common to the members of the class were "whether the defendants have conspired illegally to violate the plaintiffs [sic] rights, [and] whether the defendants have engaged in conduct which violates [Ala.Code 1975,] § 6-5-60, by engaging in an unlawful trust, combine or monopoly." The trial court's ruling with respect to class certification is not an issue on this appeal.
[2] A recent amendment to Rule 4, Ala.R.App. P., effective October 1, 2001, makes appealable an order granting or denying a motion to arbitrate. See Rule 4(d) and the Court Comments to the amendment.
[3] Bolden, in his affidavit, states that the vehicle was manufactured outside Alabama. However, he does not indicate where the vehicle was manufactured, and we cannot rely on this vague statement.