895 So.2d 215 (2004)
MASSEY AUTOMOTIVE, INC.
v.
Johnnie M. NORRIS.
1021785.
Supreme Court of Alabama.
July 2, 2004.
*216 R. Edward Massey III of Clay, Massey & Associates, Mobile, for appellant.
Derek E. Yarbrough and Shannon A. Rash of Motley, Motley & Yarbrough, LLC, Dothan, for appellee.
HARWOOD, Justice.[1]
Massey Automotive, Inc., the defendant in an action pending in the Covington Circuit Court, appeals from the trial court's order denying its motion to compel arbitration. We affirm.
On November 18, 2000, the plaintiff, Johnnie M. Norris, purchased a 2000 Chevrolet Tahoe sport-utility vehicle from the defendant Massey Automotive. Norris signed several documents presented to her by Bob Drinkwater, the finance manager of Massey Automotive, including one entitled "Arbitration Agreement."
*217 Norris later discovered that the Tahoe had been damaged before she purchased it; she claims that the damage was not divulged to her when she purchased the Tahoe. On February 5, 2001, Norris sued Massey Automotive, Drinkwater, several other employees of Massey Automotive, and the operator of the automotive body shop that had repaired the Tahoe, alleging breach of contract, breach of warranty, fraud, and fraud in the inducement. On April l6, 2001, Massey Automotive moved to compel arbitration. On May 9, 2001, Norris objected to the motion arguing, among other things, that she had been fraudulently induced by Drinkwater to sign the arbitration agreement. In support of that ground, Norris submitted her affidavit; that affidavit stated, in pertinent part, as follows:
"During my negotiations [for the purchase of the Tahoe], I was introduced to Bob Drinkwater, the finance manager at Massey Automotive, Inc. He presented the sales contract to me along with other documents which he requested I sign. Among those documents was an arbitration agreement. I am a diabetic, and I was taking Glucophage XR at the time. I was having a sugar attack while I was talking with Mr. Drinkwater, and I told him that I was having trouble reading as a result of blurry vision. I was relying on him to explain the papers he asked me to sign. With regard to the arbitration agreement, I told Mr. Drinkwater that I did not understand what an arbitration agreement was, and he told me that it was no big deal and was more or less a formality. He said that all it meant was if anything happened to the vehicle, it meant I had to bring it back to Massey [Automotive] to let them take care of it before I took it anywhere else. He never mentioned jury, courts, lawyers, nothing. I could not focus on the document and I had gotten the shakes, so I relied on what he said. He had all of the papers in a stack, and folded up the ones on top to show the signature line of the next one in the stack for me to sign. I specifically asked him about the arbitration agreement because I could not read it at the time. He lied to me about the content of the arbitration agreement just to get me to sign it. I relied on what he said, and I signed on the line he pointed to. I had no intention of signing such an agreement, and I would not have signed it or purchased the vehicle had he corrected [sic] advised me of its contents."
On May 27, 2003, the trial court held a hearing on the motion to compel arbitration, and on June 6, 2003, denied the motion without stating its reasons. Massey Automotive appealed.
Review of a trial court's ruling on a motion to compel arbitration is by direct appeal. Rule 4(d), Ala. R.App. P.; A.G. Edwards & Sons, Inc. v. Clark, 558 So.2d 358, 360 (Ala.1990). We review de novo the trial court's ruling on a motion to compel arbitration. Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala.1999).
Massey Automotive argues that Norris failed to produce substantial evidence in support of her contention that her reliance on the representations of Drinkwater was reasonable; it argues that instead of simply relying on those representations Norris could have waited for her "sugar attack" to subside so that she could read for herself the terms of the documents she signed, including the arbitration agreement.
Norris maintains that she presented substantial evidence of her reliance on Drinkwater's representations; that her reliance on Drinkwater's representations was reasonable; and that, although Drinkwater was under no duty to explain the terms of *218 the arbitration agreement to her, once he undertook to do so, he had a duty to provide an honest explanation of those terms. Citing Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967), Norris also argues that whether she was fraudulently induced to sign the arbitration agreement is a question for the trial court, and not an arbitrator, to decide.
A party seeking to compel arbitration has the burden of proving: (1) the existence of a contract containing an arbitration agreement and (2) that the underlying contract evidences a transaction affecting interstate commerce. Kenworth of Birmingham, Inc. v. Langley, 828 So.2d 288, 290 (Ala.2002). Once the party seeking to compel arbitration has made a prima facie showing as to those two items, the burden shifts to the party opposing arbitration to present evidence indicating either that the arbitration agreement is invalid or that it is inapplicable to the dispute in question. Id. Our disposition of the fraudulent-inducement issue obviates the need to address the issue whether the transaction here affected interstate commerce.
Norris argues that the arbitration agreement she entered into is invalid, because, she says, Drinkwater fraudulently induced her to enter into it; thus, she has the burden of proving her fraudulent-inducement claim. In Foremost Insurance Co. v. Parham, 693 So.2d 409 (Ala.1997), this Court held that a fraudulent-inducement claim is governed by the reasonable-reliance standard. To avoid arbitration, "[a] party must provide substantial evidence of fraud in the inducement, particularly related to the arbitration clause...." Ex parte Perry, 744 So.2d 859, 863 (Ala.1999) (opinion of three Justices). Thus, Norris was required to produce substantial evidence indicating that her reliance on Drinkwater's representations was reasonable. Under the reasonable-reliance standard, a judgment as a matter of law in favor of the defendant in a fraud case is appropriate where the party who claims fraud in the transaction was fully capable of reading and understanding the terms of the contract involved in the transaction, but instead blindly relied on the defendant's oral representations to the exclusion of written disclosures in the contract to the contrary. See Foremost Ins. Co., 693 So.2d at 421.
Massey Automotive argues that Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So.2d 777 (Ala.2000), is analogous to this case. In Harold Allen, the plaintiffs, Frances B. Early and her daughter Yolanda Early, purchased a mobile home from Harold Allen. They subsequently sued Harold Allen and the manufacturer of the mobile home. The trial court granted the defendants' motions to compel arbitration, and the Earlys appealed, arguing that the salesman for Harold Allen fraudulently induced them to sign the arbitration agreement because, they said, he failed to adequately explain the terms of the agreement. 776 So.2d at 783. Yolanda Early's affidavit stated that, when the salesman presented her and her mother with the arbitration agreement, Yolanda volunteered her own understanding of what it meant and the salesman confirmed that understanding. Specifically, she asked him if the agreement meant only that if she fell behind in her payments, the dealership would agree to arbitrate the situation, rather than take her to court. "The Earlys presented no evidence indicating that they cannot read, that the salesman prevented them from reading the documents they signed, or that they could not have understood the arbitration agreement had they taken the time to read it." 776 So.2d at 784. Under the reasonable-reliance *219 standard, the Earlys could not "blindly rely on an agent's oral representations . . . to the exclusion of written disclosures in [the contract]." Ex parte Caver, 742 So.2d 168, 172-73 (Ala.1999).
Norris, on the other hand, contends that her reliance on Drinkwater's representations was reasonable in light of our decision in W.D. Williams, Inc. v. Ivey, 777 So.2d 94 (Ala.2000). In that case, we upheld the trial court's denial of the automobile dealership's motion to compel arbitration where the customer/plaintiff testified that she was completely unaware that she had signed an arbitration agreement until the dealership moved to compel arbitration. 777 So.2d at 95. The customer/plaintiff testified that the salesman, from whom she had previously bought other vehicles, represented to her that the document she was signing related to the automobile she was trading in rather than to the one she was purchasing and that the salesman had covered the document with a file folder so that she could not see what she was signing. 777 So.2d at 98-99.
In Mitchell Nissan, Inc. v. Foster, 775 So.2d 138 (Ala.2000), the purchaser of an automobile sued the dealer alleging fraud and breach of warranty. In opposition to the dealer's motion to compel arbitration pursuant to an otherwise valid arbitration agreement, the customer argued "[t]hat he should be relieved of this contractual obligation because he has only a sixth-grade reading level." 775 So.2d at 140. On appeal, this Court reversed the order denying the motion to compel arbitration, explaining as follows:
"[T]his rule has long been established in Alabama:
"`[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents.'
"Beck & Pauli Lithographing Co. v. Houppert, 104 Ala. 503, 506, 16 So. 522, 522 (1894) (emphasis added). Accord Gaskin v. Stumm Handel GmbH, 390 F.Supp. 361, 366 (S.D.N.Y.1975) ('"If the signer could read the instrument, not to have read it was gross negligence; if he could not read it, not to procure it to be read was equally negligent; in either case the writing binds him."'). [The customer] was aware that he was signing a contract to purchase the automobile, and he does not allege that his signature was procured by fraud, deceit, or misrepresentation. Although [the customer] was aware of his limited reading ability, he did not ask his relatives who had accompanied him, or a representative of [the dealer] to read the agreement to him."
775 So.2d at 140.
In the present case, according to Norris's affidavit, by which we are bound under the procedural circumstances of this case, at the time the arbitration agreement was submitted to her along with other documents, she was having a "sugar attack" in connection with her diabetic condition, with the result that she "had gotten the shakes," was having trouble reading because of "blurry vision," and "could not focus on the document." She explained her situation to Drinkwater and "specifically asked him about the arbitration agreement because [she] could not read it at the time." She explained to him that she "did not understand what an arbitration agreement was," and he assumed the duty of explaining its meaning to her. He stated that "all that it meant was if anything happened to the vehicle, it meant I had to bring it back to Massey [Automotive] *220 to let them take care of it before I took it anywhere else." Further, he had all of the documents relating to the transaction "in a stack, and folded up the one on top to show the signature line of the next one in the stack for [her] to sign." Norris then "signed on the line [Drinkwater] pointed to." She asserts that she was relying on Drinkwater "to explain the papers he asked [her] to sign," and that she signed the arbitration agreement relying on his explanation of what it meant. She states categorically that she would not have signed the arbitration agreement or purchased the vehicle had Drinkwater correctly advised her of the contents of the arbitration agreement.
Relying on Harold Allen and Ex parte Caver, Massey Automotive argues that "nowhere in the Affidavit does Norris allege that she is unable to read." Concerning the effects she was experiencing from her "sugar attack," Massey Automotive argues that "[t]he fact that she was supposedly unable to read because of blurry vision is irrelevant because she had the ability to read and merely chose not to wait until her alleged blurry vision has subsided." In short, argues Massey Automotive, Norris "has not presented substantial evidence to show that she reasonably relied on any alleged representations made by Massey [Automotive] employees."
One of the earlier formulations of the reasonable-reliance standard was articulated in Torres v. State Farm Fire & Casualty Co., 438 So.2d 757 (Ala.1983), to which standard this Court "returned" in Foremost Insurance, supra. In Torres, the Court explained that "[i]n order to recover for misrepresentation, the plaintiff's reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." 438 So.2d at 759. Under Foremost Insurance, reliance can be declared unreasonable, as a matter of law, "where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms" that clearly contradicted the alleged misrepresentations. 693 So.2d at 421.
Under our precedents, had Norris been fully capable of reading the arbitration agreement at the time it was presented to her, her reliance on any explanation of its contents by Drinkwater would have been unreasonable if she had chosen simply to "blindly rely on [Drinkwater's] oral representations to the exclusion of written disclosures in [the] contract." Harold Allen, 776 So.2d at 784, citing Caver, 742 So.2d at 173. Once she was prevented from being able to read the document because of her impaired vision resulting from her diabetic condition, it was her responsibility to make known to Drinkwater that inability and to have the document read to her or to inquire as to its contents. According to her affidavit, she made known to Drinkwater the difficulties she was experiencing and inquired of him as to the contents of the arbitration agreement. Also according to her, he assumed the duty of explaining to her the meaning of the arbitration agreement, but misrepresented it. Under these limited and specific facts, we cannot say, as a matter of law, that Norris acted unreasonably in choosing not to wait until her alleged "blurred vision had subsided," because we have no facts suggesting how long that condition might have persisted. Conversely, under the facts, Drinkwater was equally at liberty to suggest that Norris simply wait until her blurry vision subsided and she could read the documents for herself, rather than undertaking to explain *221 to Norris what she could not then read.
Given the particular scenario of this case, we cannot say that Norris's reliance on Drinkwater's representations was unreasonable as a matter of law. We emphasize, however, that this conclusion in no way represents a departure or retreat from the rule of Foremost Insurance, Harold Allen, or Ex parte Caver; rather, it relates solely to the reasonableness of the reliance of a party to a transaction on the other party's explanation of the contents of a document forming a part of the transaction, which the party cannot read at the time it is presented because of impaired vision and, for all that appears in the record, will be unable to read for an indefinite period. The party whose vision is so afflicted must make that condition known to the other party to the transaction and request to have the document read or to have its contents explained. The other party is under no obligation, absent special circumstances, to comply with either of those requests. If the other party voluntarily agrees to the request, however, and, as is the situation under the facts as revealed in the record in this case, misrepresents the contents of the document, the vision-impaired party's reliance on that explanation is not unreasonable as a matter of law. The facts of this case, and our ruling predicated on those particular facts, do not involve a situation where a party to a transaction voluntarily allows imperfect vision to go uncorrected, such as by not using reasonably available eyeglasses. We deal here only with a situation where a party's vision is impaired to the point where he or she cannot read the text of a document and that impairment is beyond his or her control.
Accordingly, we affirm the trial court's order denying Massey Automotive's motion to compel arbitration.
AFFIRMED.
HOUSTON, LYONS, JOHNSTONE, and WOODALL, JJ., concur.
SEE, BROWN, and STUART, JJ., dissent.
SEE, Justice (dissenting).
I respectfully dissent.
On November 18, 2000, the plaintiff, Johnnie M. Norris, purchased a used 2000 Chevrolet Tahoe sport-utility vehicle from the defendant Massey Automotive, Inc. According to Norris's affidavit, Massey Automotive's finance manager, Bob Drinkwater, presented her with the sales contract and several other documents, including one entitled "Arbitration Agreement." He asked her to sign the documents. Norris states in her affidavit that she is diabetic and that as she was signing the documents she had a "sugar attack" and her vision became blurry. She states that she was having trouble reading and that she was forced to rely on Drinkwater to explain to her the documents he had asked her to sign. Norris further states that she specifically asked Drinkwater about the arbitration agreement because she could not read it at the time and that Drinkwater told her that the arbitration agreement was merely a formality, that "all it meant was if anything happened to the vehicle, it meant I had to bring it back to Massey [Automotive] and let them take care of it before I took it anywhere else."
On February 5, 2001, Norris sued Massey Automotive and several Massey Automotive employees alleging breach of contract, fraud, and fraud in the inducement. On April l6, 2001, Massey Automotive moved to compel arbitration. In support of its motion to compel arbitration, Massey Automotive submitted a brief and the affidavit of its general manager, Rusty Sibley. Sibley stated in his affidavit:

*222 "The vehicle made the subject of this suit was purchased by Johnnie M. Norris and was manufactured in Arlington, Texas and transported across state lines to its final destination in Andalusia, Alabama. Furthermore the funding for the purchase of this vehicle was provided by AmSouth Bank which has branch locations in the states of Alabama, Georgia, and Tennessee.
"Finally, one of the primary owners of Massey Automotive Group, Walt Massey, is a resident citizen of the State of Mississippi, and a portion of the income from Massey Automotive Group is paid to Walt Massey in Lucedale, Mississippi."
Norris objected to Massey Automotive's motion to compel arbitration, arguing that Massey Automotive had not met its burden of proving that the transaction had a substantial effect on interstate commerce and that Drinkwater had fraudulently induced her to sign the arbitration agreement, thereby invalidating the agreement.
The trial court requested supplemental briefs addressing whether the sale of the Tahoe was a transaction that substantially affected interstate commerce. In its supplemental brief, Massey Automotive stated that the funds paid by Norris for her purchase of the Tahoe were used to pay Massey Automotive's outstanding balance to GMAC for the floor-plan financing of the Tahoe. Massey Automotive also submitted the affidavit of its business manager, Betty Reeves, who confirmed that she sent $26,000 to GMAC Financial Services located in Duluth, Georgia, in order to pay the amount Massey Automotive owed on the Tahoe. In her supplemental brief, Norris argued that under Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000), arbitration should be denied, because, she argued, the sale of the Tahoe was not a transaction that substantially affected interstate commerce.
On May 27, 2003, the trial court held a hearing on the motion to compel arbitration. On June 6, 2003, the trial court, without stating its reasons, denied the motion. Massey Automotive appealed; however, on June 23, 2003, Massey Automotive also moved the trial court to reconsider its denial of arbitration, arguing that the decision of the Supreme Court of the United States in Citizens Bank v. Alafabco, Inc., 539 U.S. 52, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003), explicitly overruled Sisters of the Visitation. The trial court has not ruled on Massey Automotive's motion to reconsider.
All of the documents Norris signed form a single contract. See ANCO TV Cable Co. v. Vista Communications Ltd. P'ship I, 631 So.2d 860 (Ala.1993); Cole v. Yearwood, 241 Ala. 437, 439, 3 So.2d 1, 2 (1941)("Two or more instruments executed contemporaneously by the same parties in reference to the same subject matter constitute one contract, and should be construed as one transaction with reference to each other, or they may be construed together in determining the contract."). A misrepresentation about contract provisions therefore goes to the validity of the entire contract. See Quality Truck & Auto Sales, Inc. v. Yassine, 730 So.2d 1164, 1168 (Ala.1999). Norris states in her affidavit that, "I was relying on him to explain the papers he asked me to sign." Thus, Norris's claim that Drinkwater misrepresented the content of the arbitration agreement is an attack not just on that provision but on the validity of the entire contract. Norris must either accept the contract or reject it. She cannot pick and choose by which provisions she is bound. Delta Constr. Corp. v. Gooden, 714 So.2d 975, 981 (Ala.1998). Norris is suing based *223 on breach of the contract; therefore, she accepts the contract.
The main opinion cites Mitchell Nissan, Inc. v. Foster, 775 So.2d 138, 140 (Ala.2000), for the following rule of law:
"`[A] person who signs an instrument without reading it, when he can read, can not, in the absence of fraud, deceit or misrepresentation, avoid the effect of his signature, because [he is] not informed of its contents; and the same rule [applies] to one who can not read, if he neglects to have it read, or to enquire as to its contents.'"
(Quoting Beck & Pauli Lithographing Co. v. Houppert, 104 Ala. 503, 506, 16 So. 522, 522 (1894)(emphasis omitted).) The main opinion also notes that in Torres v. State Farm Fire & Casualty Co., 438 So.2d 757, 759 (Ala.1983), this Court explained that "[i]n order to recover for misrepresentation, the plaintiff's reliance must, therefore, have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." As the main opinion states, under Foremost Insurance Co. v. Parham, 693 So.2d 409, 421 (Ala.1997),
"the trial court can enter a judgment as a matter of law in a fraud case where the undisputed evidence indicates that the party or parties claiming fraud in a particular transaction were fully capable of reading and understanding their documents, but nonetheless made a deliberate decision to ignore written contract terms."
In Torres, this Court stated: "Because it is the policy of courts not only to discourage fraud but also to discourage negligence and inattention to one's own interests, the right of reliance comes with a concomitant duty on the part of the plaintiffs to exercise some measure of precaution to safeguard their interests." 438 So.2d at 758-59. In Torres, the Torreses argued that when they requested flood insurance on their house an employee of their insurance agent misrepresented to them that "she would `take of it.'" 438 So.2d at 759. Because the Torreses simply relied on the alleged misrepresentation of the employee and failed to later read their insurance premium statements and their homeowner's insurance policy to see if flood-insurance coverage had been added, this Court held that "the plaintiffs failed to exercise ordinary diligence in relying on [the employee's] statement." 438 So.2d at 759.
In this case, Norris states that she was aware that she was in fact signing an arbitration agreement that related to the Tahoe she was purchasing. She claims that the blurry vision she experienced while signing the documents temporarily hindered her ability to read documents; therefore, she claims, she reasonably relied on Drinkwater's representations. Rather than choosing to postpone signing the documents until after her "sugar attack" had subsided, or asking that the provision be read to her, Norris chose to sign the documents without reading them. A person may not claim fraudulent inducement based on an agent's oral representations when that person is able to read but has failed to read the terms of the contract. See Harold Allen's Mobile Home Factory Outlet, Inc. v. Early, 776 So.2d 777, 784 (Ala.2000); Ex parte Caver, 742 So.2d 168, 172 (Ala.1999); Foremost Insurance, 693 So.2d at 433.
The main opinion states that Norris, who can read but who was temporarily unable to read the contract when it was presented to her, was reasonable in her reliance on the alleged misrepresentation because she asked Drinkwater to explain to her the contents of the arbitration *224 agreement and he assumed the duty of explaining that agreement. Unlike the plaintiff in Mitchell Nissan, Norris is able to read. She was fully capable of reading the arbitration agreement once her "sugar attack" subsided, or she could have asked that the document be read to her. Thus, I believe that our precedent requires Norris to have read the arbitration agreement or to have had it read to her before she signed it. See Harold Allen, 776 So.2d at 784; Ex parte Caver, 742 So.2d at 173; Torres, 438 So.2d at 759. Norris chose, instead, to have Drinkwater describe the document to her. I fail to see the principled distinction between one who is temporarily unable to read a document  perhaps having left one's glasses at home  and one who simply chooses not to read a document and to instead ask what it means.
I do not believe that Norris has met her burden of showing that the arbitration agreement was invalid, nor has she presented substantial evidence to support her claim that Drinkard fraudulently induced her to sign the arbitration agreement. I am also mindful that this Court is obliged to apply the same contract law to arbitration agreements that it applies to all other contractual agreements. First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). Thus, the law this Court applies here today is equally the law with respect to one who asks the meaning of any other contractual provision instead of reading the contract. See Foremost Insurance, 693 So.2d at 437 (Ala.1997)(Shores, J., concurring specially)("the Court's departure from the reasonable reliance rule . . . . may . . . have encouraged victims of fraud to avoid discovering potential fraud when it could have been discovered by checking oral representations against the documents memorializing the transaction"); see also Foremost Insurance, 693 So.2d at 438-39 (See, J., concurring specially)("[s]evering the buyer's right to rely from his duty to act in a reasonable manner has discouraged buyers from reading their contracts. It has reduced the traditional costs associated with such laxity by insulating the buyer from its consequences and by providing an incentive for the buyer to recast his own carelessness as the seller's `fraud'" (footnote omitted)).
In addition to establishing the existence of a contract containing an arbitration provision, in order to compel arbitration the moving party must show that the transaction at issue "sufficiently `involved commerce' to trigger application of the FAA." Wolff Motor Co. v. White, 869 So.2d 1129, 1133 (Ala.2003). A transaction involves interstate commerce "if in the aggregate the economic activity in question would represent `a general practice . . . subject to federal control.'" Citizens Bank, 539 U.S. at 57, 123 S.Ct. 2037 (quoting Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 236, 68 S.Ct. 996, 92 L.Ed. 1328 (1948)). There is no question that the sale of the Tahoe to Norris involved interstate commerce. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)(holding that the requirement that a transaction involve interstate commerce should be read in the broadest terms because the word "involving" signals "an intent to exercise Congress' commerce power to the full"). Massey Automotive submitted the affidavits of Rusty Sibley, its general manager, and Betsy Reeves, its business manager. Sibley stated in his affidavit that the Tahoe "was manufactured in Arlington, Texas and transported across state lines to its final destination in Andalusia, Alabama," and that the funding for the purchase of the Tahoe was provided by AmSouth Bank, which has branch locations in Alabama, Georgia, and Tennessee. Reeves stated in her affidavit that the Tahoe was financed by GMAC Financial Services, *225 which is located in Duluth, Georgia. She stated in her affidavit that the funds Norris paid to Massey Automotive when she purchased the Tahoe were paid by Reeves to GMAC in Georgia in accordance with the terms of the floor-plan financing agreement. Thus, Massey Automotive has presented ample evidence indicating that the sale of the used Tahoe to Norris is a transaction that involves interstate commerce. See Jim Burke Auto., Inc. v. McGrue, 826 So.2d 122, 130 (Ala.2002)(noting that the sale of the used automobile was a transaction affecting interstate commerce when financing for the purchase involved two out-of-state financial corporations). Norris has not produced substantial evidence indicating that Drinkwater fraudulently induced her to sign the agreement and Massey Automotive has produced sufficient evidence indicating that the transaction at issue involves interstate commerce. Therefore, I dissent from the main opinion's affirmance of the order of the trial court denying the motion to compel arbitration; I would reverse the order of the trial court.
NOTES
[1] This case was originally assigned to another Justice on this Court. It was reassigned to Justice Harwood on May 19, 2004.