849 So.2d 159 (2002)
McCONNELL AUTOMOTIVE CORPORATION et al.
v.
Robert JACKSON and Kisha Jackson.
1010006.
Supreme Court of Alabama.
November 1, 2002.
Michael P. Windom of Windom & Tobias, L.L.C., Mobile, for appellants.
John Ronald Spencer, Mobile, for appellees.
MADDOX, Retired Justice.
The sole question presented by this appeal is whether the trial court erred in refusing to compel arbitration in this case on the basis that the underlying transaction did not have a substantial effect on *160 interstate commerce. The plaintiffs, Robert Jackson and Kisha Jackson, claimed that the defendants, McConnell Automotive Corporation ("McConnell"); Terry Anderson, a sales representative for McConnell ("Anderson"); and Stacy Hill, the used-car manager of McConnell ("Hill"), were guilty of fraud, misrepresentation, suppression, and deceit arising out of the sale of a used automobile.[1]
The defendants filed a motion to dismiss the Jacksons' complaint, or alternatively, to compel arbitration. They attached as exhibits to the motion a "Used Vehicle Retail Buyer's Order" and the "Arbitration Agreement." Both of those documents were signed by Kisha Jackson. In support of their motion to compel arbitration, the defendants filed an affidavit of Raymond Zakutney, a vice president of McConnell, and affidavits of Anderson and Hill, in which they showed the history of the motor vehicle that is the subject of this dispute.

Facts
On or about March 8, 2001, Kisha Jackson purchased a 1999 Cadillac DeVille automobile from McConnell.[2] Anderson was a sales representative for McConnell, and, according to an affidavit filed in the trial court by Kisha Jackson, was the salesperson with whom she dealt. In her affidavit she stated that "[b]efore purchasing [the] vehicle [she] asked Terry Anderson whether the Cadillac DeVille had been wrecked" and "[he] assured [her] that it had not been wrecked." She also stated in her affidavit that she spoke with Hill, who was the used-car manager of McConnell, and that she asked Hill if the vehicle had been wrecked and "[he] assured [her] that it had not been wrecked."
The question crucial to a determination of this particular appeal is whether the defendants can enforce the arbitration agreement executed by Kisha Jackson at the time of the transaction in accordance with its terms. The arbitration agreement was a separate document; it reads:

"ARBITRATION AGREEMENT
"Buyer/lessee acknowledges and agrees that the vehicle purchased or leased herein has traveled in interstate commerce. Buyer/lessee thus acknowledges that the vehicle and other aspects of the sale, lease or financing transaction are involved in, affect, or have a direct impact upon, interstate commerce. *161 "Buyer/lessee and dealer agree that all claims, demands, disputes, or controversies of every kind or nature that may arise between them concerning any of the negotiations leading to the sale, lease or financing of the vehicle, terms and provisions of the sale, lease or financing agreement, arrangements for financing, purchase of insurance, purchase of extended warranties or service contracts, the performance or condition of the vehicle, or any other aspects of the vehicle and its sale, lease or financing shall be settled by binding arbitration conducted pursuant to the provision of 9 U.S.C. Section 1 et seq. and according to the Commercial Rules of the Mobile Better Business Bureau. Without limiting the generality of the foregoing, it is the intention of the buyer/lessee and the dealer to resolve by binding arbitration all disputes between them concerning the vehicle, its sale, lease or financing, and its condition, including disputes concerning the terms and conditions of the sale, lease or financing, the condition of the vehicle, any damage to the vehicle, the terms and meaning of any of the documents signed or given in connection with the sale, lease or financing, any representations, promises or omissions made in connection with negotiations for the sale, lease, or financing of the vehicle, or any terms[,] conditions, or representations made in connection with the financing, credit life insurance, disability insurance, and vehicle extended warranty or service contract purchased or obtained in connection with the vehicle. "Either party may demand arbitration by filing with the American Arbitration Association a written demand for arbitration along with a statement of the matter in controversy. A copy of the demand for arbitration shall simultaneously be served upon the other party. The buyer/lessee and the dealer agree that the arbitration proceedings to resolve all such disputes shall be conducted in the city where dealer's facility is located."
Although the trial judge did not state his reasons for denying the defendants' motion to compel arbitration, it seems apparent from the record that the trial judge, after considering the oral arguments of counsel and the holdings of cases cited by the parties, determined that the transaction did not have a substantial effect on interstate commerce.
In conducting our de novo review we have studied the evidence that was before the trial court. That evidence shows that McConnell purchased the Cadillac from General Motors Auction Department, located in Warren, Michigan, at an auction conducted by ADESA Birmingham, located in Moody, Alabama. When McConnell purchased the vehicle it had a Georgia certificate of title issued on October 27, 1998. The certificate of title shows the owner of the vehicle as follows:
"GMAC
"Daniel, Dolores R.
"PO Box 55306
"Birmingham, AL 35255"
Under the subheading "1st Lien Or Security Interest," the following appears:
"GMAC
"PO Box 8107
"Cockeysville, MD 21030"
The document evidencing the sale of the Cadillac shows that the seller was General Motors Auction Department, 30007 Van Dyke Avenue, Warren, Michigan, and that the buyer was McConnell.
There is other evidence in the record indicating that the vehicle was transported from Georgia to Alabama; that McConnell, although its principal place of business is located in Mobile, in the course of that business has sold motor vehicles to customers *162 who reside out of state; and that McConnell has financed motor vehicles with companies whose principal places of business are not within Alabama.

I.
We first note that a direct appeal is the proper procedure to obtain appellate review of a trial court's order granting or denying a motion to compel arbitration. See Rule 4(d), Ala. R.App. P.; Tefco Fin. Co. v. Green, 793 So.2d 755, 758 (Ala.2001). The scope of this Court's review on appeal is de novo. Id. The burden of proving that the subject transaction substantially affected interstate commerce is on the party seeking to compel arbitration. Id. See also Transouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999), and Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 (Ala.1995) (opinion on rehearing). If a movant meets the burden required by law, the burden then shifts to the nonmovant to present evidence indicating that the arbitration agreement is not valid or does not apply to the disputed question. Id.

II.
We now consider the crucial issue on this appeal: Did the defendants present sufficient evidence to show that the subject transaction had a substantial effect on interstate commerce? The defendants argue that the evidence shows that McConnell is an automobile dealership located in Mobile, Alabama; that it sells new and used vehicles; and that it sells vehicles to customers who reside out of state. McConnell also argues that it has financed vehicles with companies whose principal places of business are outside the State of Alabama.
The defendants, in their brief to this Court, contend that the arbitration agreement Kisha Jackson signed is enforceable under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq., as interpreted by the Supreme Court of the United States in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).
Although the defendants rely on Allied-Bruce Terminix, they recognize that this Court, in Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala. 2000), now requires that there be a "substantial" effect on interstate commerce for a transaction to be governed by the provisions of the FAA. They contend that the facts of this case are similar to other motor-vehicle arbitration cases decided by this Court, in which this Court has compelled arbitration in accordance with the terms and conditions of an arbitration agreement. They cite Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249 (Ala. 1997), which involved the sale of a used motor vehicle, and in which this Court analyzed the arbitration agreement and an affidavit executed by the dealership's president and affirmed the trial court's order enforcing the arbitration agreement. The defendants also rely on Jim Burke Automotive, Inc. v. McGrue, 826 So.2d 122 (Ala.2002). McGrue, the plaintiff in that case, purchased a used Nissan Altima automobile from the defendant, Jim Burke Automotive, Inc. ("Jim Burke"). After the purchase, she brought conspiracy and antitrust claims against Jim Burke; Roebuck Mazda; Med-Center Mazda; Crown Pontiac-Nissan, Inc.; Crown Automobile Company, Inc.; King Acura; Limbaugh Toyota; Susan Schein Chevrolet, Inc.; Premier Chevrolet, Inc.; Neil Bonnett Honda; Lynn Layton Chevrolet Company; Jim Skinner Ford; Edwards Chevrolet Company, Inc.; Roebuck Chrysler-Plymouth-Jeep-Eagle, Inc.; Roebuck Honda; Tameron Automotive Group; Hoover Toyota, L.L.C.; Courtesy Pontiac-GMC, Inc.; *163 Century Chevrolet-Geo, Inc.; Royal Oldsmobile Company, Inc.; Steel City Pontiac GMC; and Serra Toyota, Inc. (the Court referred to these other automobile dealerships as "the nonsignatory defendants"). She also alleged that her constitutional right to a trial by jury had been violated and requested certification of her case as a class action.
In that case, Jim Burke and the nonsignatory defendants filed motions to compel McGrue to arbitrate her claims, citing three arbitration agreements executed by her and Jim Burke in conjunction with her purchase of the Altima. The trial court denied the motions. Jim Burke and the nonsignatory defendants appealed, in six separate appeals; those appeals were consolidated. This Court reversed the trial court's order denying Jim Burke's motion to compel arbitration, but affirmed the orders denying the nonsignatory defendants' motions to compel arbitration, and remanded the case.
This Court, in McGrue, summarized the law of Alabama relating to the enforceability of an arbitration clause:
"We first address the question whether the FAA applies to the arbitration agreement McGrue signed when she purchased the used motor vehicle from Jim Burke. Section 8-1-41(3), Ala.Code 1975, prohibits specific enforcement of `[a]n agreement to submit a controversy to arbitration.' However, § 2 of the FAA, 9 U.S.C. § 2, provides:
"`A written provision in ... a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.'
"This Court has recognized that under this section the FAA preempts conflicting state law where an arbitration agreement is contained in a contract that `evidenc[es] a transaction involving [interstate] commerce.' Ex parte Jones, 628 So.2d 316 (Ala.1993); Ex parte Phelps, 672 So.2d 790 (Ala.1995); see Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Thus, an arbitration provision contained in a contract that, in fact, evidences a transaction involving interstate commerce is put `"on the same footing" as other terms of a contract.' Phelps, 672 So.2d at 793 (quoting Allied-Bruce Terminix, 513 U.S. at 275, 115 S.Ct. 834).
"We note that nothing in the record suggests, and that McGrue does not contend, that the arbitration agreement she entered with Jim Burke is invalid. Therefore, the FAA will apply to that arbitration agreement if it appears in a contract evidencing a transaction `involving interstate commerce in fact, so as to be within Congress's power to regulate under the Commerce Clause.' Coastal Ford, Inc. v. Kidder, 694 So.2d 1285, 1287 (Ala.1997). The burden of proving that the transaction at issue in this case substantially affected interstate commerce is on Jim Burke and the nonsignatory defendants, because they seek to compel arbitration. See TranSouth Fin. Corp. v. Bell, 739 So.2d 1110, 1114 (Ala.1999).
"In Hurst v. Tony Moore Imports, Inc., 699 So.2d 1249 (Ala.1997), a plurality of this Court (four Justices) concluded that the sale of a used motor vehicle is, per se, a transaction involving interstate commerce and, thus, triggers application of the FAA. However, in Southern United Fire Insurance Co. v. Knight, 736 So.2d 582 (Ala.1999), this Court declined to adopt that proposition as a per se rule *164 for determining whether the purchase of a used motor vehicle is a transaction involving interstate commerce. Instead, in Sisters of the Visitation v. Cochran Plastering Co., 775 So.2d 759 (Ala.2000), this Court listed factors a court should consider when determining if a transaction has had a `substantial effect' on interstate commerce. These factors are: (1) the citizenship of the parties and any affiliation they have with out-of-state entities; (2) tools and equipment used in performance of the contract; (3) allocation of the contract price to cost of services and to cost of materials involved in performance of the contract; (4) subsequent movement of the object of the contract across state lines; and (5) the degree to which the contract at issue was separable from other contracts that are subject to the FAA. Id. at 765-66.
"Relying primarily on David Bolden's affidavit, quoted above, we conclude that Jim Burke and the nonsignatory defendants met their burden imposed by this Court's listing of the several factors in Sisters of the Visitation. Admittedly, the sale and purchase of the used vehicle in this case occurred in Alabama and occurred between two Alabama residents. (The record does not indicate that Jim Burke is affiliated with a national network of automobile dealerships. Cf. Allied-Bruce Terminix, supra.) Bolden's affidavit states that Southwest Tex Leasing Company, a company located in San Antonio, Texas, purchased the vehicle from the manufacturer. Southwest Tex then sold the vehicle to American Sales & Leasing, a company located in Orlando, Florida. Finally, Jim Burke bought the vehicle in Florida, from American Sales & Leasing, and subsequently sold the vehicle to McGrue in Alabama. The financing of the purchases involving this vehicle involved two out-of-state financial corporations: Ford Motor Credit Company of Delaware financed the sale to Southwest Tex, and Chrysler Financial Company, L.L.C., a Michigan corporation, financed McGrue's purchase of the vehicle.
"We contrast this case with Tefco Finance Co. v. Green, 793 So.2d 755 (Ala. 2001). Tefco involved the sale of a used motor vehicle by an Alabama automobile dealership to an Alabama resident, with an Alabama corporation financing the transaction. Id. at 756. The dealership and the financial institution, as defendants, moved to compel arbitration and to transfer the case to another county; to their motion they attached an affidavit in which the vice president of the dealership, also acting as vice president of the financial institution, stated that all the business in the transaction at issue had occurred exclusively in a particular county in Alabama. Id. This Court held that the arbitration agreement was unenforceable because the defendants had failed to prove the impact of the transaction on interstate commerce. Id. In this case, we have an affidavit that clearly describes the interstate activities of the transaction.
"Thus, we hold that the purchase of this vehicle substantially affected interstate commerce and that the FAA does apply to make the arbitration agreement in this case enforceable."
826 So.2d at 128-30 (footnote omitted). The facts of this case are similar to those in McGrue, in that the sale and purchase of the used vehicle in this case occurred in Alabama between two Alabama residents, as was true in the McGrue case. In this case, the automobile apparently was initially leased from GMAC by an Alabama resident, and the owner was listed as "GMAC, Daniel, Dolores R.," with an address shown as "PO Box 55306, Birmingham, Alabama." The first lienholder on the vehicle *165 was shown as "GMAC, PO Box 8107, Cockeysville, Maryland." The vehicle was brought from Georgia to Alabama, and was sold to McConnell by ADESA Birmingham, Moody, Alabama, on behalf of General Motors Auction Department, whose principal office is located at 30007 Van Dyke Avenue, Warren, Michigan.
In McGrue, an affiant stated that Southwest Tex Leasing Company, a company located in San Antonio, Texas, had purchased the vehicle from the manufacturer and that Southwest Tex then sold the vehicle to American Sales & Leasing, a company located in Orlando, Florida, and that "[f]inally, Jim Burke bought the vehicle in Florida, from American Sales & Leasing, and subsequently sold the vehicle to McGrue in Alabama." 826 So.2d at 129.
The facts in McGrue differ from the facts in this case, in that the financing of the purchase of the vehicle in McGrue involved two out-of-state financial corporations: Ford Motor Credit Company, a Delaware corporation, financed the sale to Southwest Tex, and Chrysler Financial Company, L.L.C., a Michigan corporation, financed McGrue's purchase of the vehicle. Here, it is undisputed that, although the vehicle was initially leased from GMAC, Kisha Jackson paid cash for the vehicle.
Although this Court in McGrue abandoned the per se rule a plurality of this Court had adopted in Hurst, it nevertheless has not embraced the holding in Tefco Finance Co. v. Green, 793 So.2d 755 (Ala. 2001). This Court, in McGrue, distinguished Tefco on the ground that the facts in Tefco showed that the sale of the used motor vehicle in that case was by an Alabama automobile dealership to an Alabama resident and that an Alabama corporation financed the transaction. Id. at 756. In fact, in that case, the vice president of the dealership, also acting as vice president of the financial institution, stated that all the business in the transaction at issue had occurred exclusively in a particular county in Alabama. Id. In Tefco, this Court reasoned, as follows:
"We conclude that Tefco did not meet its burden, because it presented no evidence indicating how the aggregate effects of this intrastate purchase of a used automobile affects interstate commerce. It is undisputed that the plaintiff is an Alabama resident, that the defendants are Alabama businesses, and that the entire transaction involving the sale and financing of the automobile occurred within Alabama. The defendants assert that the Escort [automobile] was manufactured outside Alabama and that, by its very nature, it can be transported across state lines. However, the only evidence presented in support of their motion to compel arbitration was an affidavit expressly isolating the entire transaction within this state. Nothing before the trial court indicated that Green had taken the Escort across state lines or that her purchase of the Escort had any effect on interstate commerce. The defendants do not even allege that they have other customers who have traveled outside Alabama in an automobile the defendants have sold or financed, so as to show that the sale and financing of Green's automobile was part of a pattern of economic activities that in the aggregate affected interstate commerce. For this reason, we must conclude that the trial court properly held that the contract did not involve interstate commerce. Thus, § [8-1-41(3)], Ala.Code 1975, applies. That section precludes enforcement of the arbitration agreement."
793 So.2d at 759-60 (footnote omitted). The Jacksons close their argument in their brief to this Court, as follows:

*166 "Instead of focusing on the facts of the transaction involved in this action, McConnell, Anderson and Hill focus on the facts of a previous transaction in which Kisha Jackson was not involved. However, the facts in that previous transaction likewise demonstrate that an Alabama corporation purchased a used vehicle from an entity bearing an Alabama address at an auto auction in Alabama. The vehicle was delivered to the buyer in Alabama. And, all of the rights, duties and obligations of the parties to that other transaction arose in Alabama. Unlike the evidence in Jim Burke Automotive v. McGrue, supra, the competent evidence here demonstrates that this intrastate transaction does not have a substantial effect on interstate commerce."
(Jacksons' brief, p. 18; emphasis original.)
We agree with the Jacksons. Although the facts in this case are similar to the facts in McGrue, we believe, after a de novo review of the evidence that was before the trial court, that some of the critical facts necessary to show a pattern of economic activity that in the aggregate substantially affected interstate commerce are not present here. In McGrue, although the automobile was sold by an Alabama automobile dealership to an Alabama resident, the record showed that an out-of-state corporation financed McGrue's purchase of the automobile, and in McGrue, this Court "contrast[ed] [McGrue] with Tefco Finance Co. v. Green, 793 So.2d 755 (Ala.2001). Tefco involved the sale of a used motor vehicle by an Alabama automobile dealership to an Alabama resident, with an Alabama corporation financing the transaction." 826 So.2d at 130. Here, it is undisputed that Kisha Jackson paid cash for the vehicle. We further note that, in McGrue, this Court distinguished Tefco on the ground that the facts in Tefco showed that the sale of the used motor vehicle in that case was by an Alabama automobile dealership to an Alabama resident and that an Alabama corporation had financed the transaction. 793 So.2d at 756. We further note that in McGrue the automobile dealership purchased the vehicle at an out-of-state auction, and that in this case McConnell purchased the automobile at an auction conducted in Alabama.
Based on the foregoing, we hold that the trial court did not err in refusing to compel arbitration in this case. Consequently, the judgment of the trial court is due to be affirmed.
This opinion was prepared by Retired Justice Hugh Maddox, sitting as a Justice of this Court pursuant to § 12-18-10(e).
AFFIRMED.
HOUSTON, HARWOOD, and STUART, JJ., concur.
MOORE, C.J., and LYONS, BROWN, JOHNSTONE, and WOODALL, JJ., concur in the result.
SEE, J., dissents.
SEE, Justice (dissenting).
I respectfully dissent from the conclusion of the main opinion that Kisha Jackson's purchase of an automobile did not substantially affect interstate commerce.
The main opinion distinguishes this case from Jim Burke Automotive, Inc. v. McGrue, 826 So.2d 122 (Ala.2002). McGrue purchased a car from Jim Burke Automotive, Inc. ("Jim Burke"), and executed an arbitration agreement. McGrue had problems with the car, and she sued Jim Burke and other defendants, asserting conspiracy and antitrust claims. Jim Burke moved to compel arbitration, but the trial court denied that motion. This Court reversed, finding that there was a binding arbitration agreement and that the *167 transaction substantially affected interstate commerce.
The main opinion would distinguish this case from McGrue because Kisha Jackson paid cash for her car and because the dealership purchased the car at an auction conducted in Alabama, whereas the car McGrue purchased was financed by two out-of-state financial corporations and was purchased by the dealership at an out-of-state auction.
The main opinion notes:
"[The] evidence shows that McConnell purchased the Cadillac from General Motors Auction Department, located in Warren, Michigan, at an auction conducted by ADESA Birmingham, located in Moody, Alabama. When McConnell purchased the vehicle it had a Georgia certificate of title issued on October 27, 1998. The certificate of title shows the owner of the vehicle as follows:
"`GMAC
"`Daniel, Dolores R.
"`PO Box 55306
"`Birmingham, AL 35255'
"Under the subheading `1st Lien Or Security Interest,' the following appears:
"`GMAC
"`PO Box 8107
"`Cockeysville, MD 21030'
"The document evidencing the sale of the Cadillac shows that the seller was General Motors Auction Department, 30007 Van Dyke Avenue, Warren, Michigan, and that the buyer was McConnell.
"There is other evidence in the record indicating that the vehicle was transported from Georgia to Alabama; that McConnell, although its principal place of business is located in Mobile, in the course of that business has sold motor vehicles to customers who reside out of state; and that McConnell has financed motor vehicles with companies whose principal places of business are not within Alabama."
849 So.2d at 161-62. Nevertheless, the main opinion concludes that the transaction did not substantially affect interstate commerce because, it reasons, the sale from McConnell to Jackson was an in-state sale, for cash, between an in-state seller and an in-state buyer. I dissent because I believe the main opinion applies the wrong test and therefore reaches an incorrect result.

Standard of Review
This Court reviews de novo a trial court's denial of a motion to stay its proceedings pending arbitration.[3]Tefco Fin. Co. v. Green, 793 So.2d 755 (Ala.2001); Green Tree Fin. Corp. v. Vintson, 753 So.2d 497, 502 (Ala.1999). This Court has held that "`to prevail on an assertion of arbitrability, the moving party is required to produce some evidence which tends to establish its claim,'" Jim Burke Auto., Inc. v. Beavers, 674 So.2d 1260, 1265 (Ala. 1995) (opinion on application for rehearing) (quoting In re American Freight Sys., Inc., 164 B.R. 341, 345 (D.Kan.1994)), and "`has the burden of proving the existence of a contract calling for arbitration and proving that that contract involves a transaction affecting interstate commerce,'" Tefco Fin. Co. v. Green, 793 So.2d at 758 (quoting Ex parte Caver, 742 So.2d 168, 172 n. 4 (Ala.1999))(emphasis added).

*168 Commerce Clause Jurisprudence

In 1824, in Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 6 L.Ed. 23 (1824), the Supreme Court of the United States addressed the scope of the Commerce Clause. The New York Legislature had granted Ogden a monopoly "right to navigate waters" between Elizabethtown, New Jersey, and New York, New York. Id. Gibbons had infringed that right by operating two ships on the Elizabethtown-New York route, and the New York court had enjoined Gibbons's operation. The Supreme Court of the United States reversed, finding that navigation was commerce and that Congress's power over commerce preempted New York's licensing scheme. Chief Justice Marshall, writing for the Court, stated:
"Commerce, undoubtedly, is traffic, but it is something more: it is intercourse....
"....
"The subject to which the power is next applied, is to commerce `among the several States.' The word `among' means intermingled with. A thing which is among others, is intermingled with them. Commerce among the States, cannot stop at the external boundary line of each State, but may be introduced into the interior."
22 U.S. (9 Wheat.) at 189-94. Chief Justice Marshall continued:
"It is not intended to say that these words comprehend that commerce, which is completely internal, which is carried on between man and man in a State, or between different parts of the same State, and which does not extend to or affect other States....
"... The genius and character of the whole government seem to be, that its action is to be, applied to all the external concerns of the nation, and to those internal concerns which affect the States generally; but not to those which are completely within a particular State, which do not affect other States, and with which it is not necessary to interfere, for the purpose of executing some of the general powers of the government...."
22 U.S. (9 Wheat.) at 194-95. Nonetheless, it was not until 1887 that the passage of the Interstate Commerce Act, 15 U.S.C. § 1, "ushered in a new era of federal regulation under the commerce power." United States v. Lopez, 514 U.S. 549, 554, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Then, in 1937, in response to the New Deal legislation, the Supreme Court of the United States upheld the National Labor Relations Act and the National Labor Relations Board's decision to end the practice of discharging employees for union activity. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937).[4] The Supreme Court held that intrastate activities could "have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions...." Id. at 37, 57 S.Ct. 615.
Four years later, the Supreme Court upheld the Fair Labor Standards Act, which regulated the hours and wages of employees engaged in local manufacturing and prohibited the shipment of goods produced by manufacturers that were paying their employees less than the prescribed minimum wage or that were requiring more than the prescribed maximum number *169 of hours of work. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941). In Darby, the Court reaffirmed the notion that substantial intrastate activities could affect interstate commerce. Subsequently, the Supreme Court stated that "[a]ctivities that affected interstate commerce directly were within Congress' power; activities that affected interstate commerce indirectly were beyond Congress' reach." Lopez, 514 U.S. at 555, 115 S.Ct. 1624, citing A.L.A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 546, 55 S.Ct. 837, 79 L.Ed. 1570 (1935)(emphasis added).
In 1942, in Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942), the Supreme Court of the United States held that, under the Commerce Clause, Congress had the power to limit the production of wheat by a farmer who had sowed 23 acres of wheat for consumption on his own farm.[5] The Supreme Court instructed, first, that in weighing the effect of an activity on interstate commerce, courts are to consider the aggregate effect of that type of activity on interstate commerce. 317 U.S. at 124-28, 63 S.Ct. 82; see also Hodel v. Virginia Surface Mining & Reclamation Ass'n, 452 U.S. 264, 277, 101 S.Ct. 2352, 69 L.Ed.2d 1 (1981); Tefco Fin. Co., 793 So.2d at 759. Furthermore, the Wickard Court expressly rejected the earlier "direct-/indirect-effects" analysis of interstate commerce; thus, the Court stated:
"[E]ven if appellee's activity be local and though it may not be regarded as commerce, it may still, whatever its nature, be reached by Congress if it exerts a substantial economic effect on interstate commerce, and this irrespective of whether such effect is what might at some earlier time have been defined as `direct' or `indirect.'"[6]
317 U.S. at 125, 63 S.Ct. 82. The Wickard Court noted that the fact that Filburn's contribution to the demand for wheat "may be trivial by itself is not enough to remove him from the scope of federal regulation, where ... his contribution, taken together with that of many others similarly situated, is far from trivial." Id. at 127-28, 63 S.Ct. 82.
For over 50 years, following Wickard and up until Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626, the Supreme Court did not overturn a congressional act on the basis that the act violated the Commerce Clause. Then, in Lopez, the Supreme Court found that the relationship between *170 the Gun-Free School Zones Act and interstate commerce was too attenuated to find a substantial effect on commerce.[7] Lopez was convicted of possession of a firearm in a school zone in violation of the Gun-Free School Zones Act. Reviewing several Commerce Clause cases, the Court identified three categories of activity Congress may regulate under its commerce power:
"First, Congress may regulate the use of the channels of interstate commerce.... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce, ... i.e., those activities that substantially affect interstate commerce."
514 U.S. at 558-59, 115 S.Ct. 1624.
The government had argued in Lopez that crime in and around schools has a substantial effect on interstate commerce because "the costs of violent crime are substantial" and "violent crime reduces the willingness of individuals to travel to areas within the country that are perceived to be unsafe." Id. at 563-64, 115 S.Ct. 1624. The Supreme Court, however, refused to accept the government's argument because, it reasoned, the Gun-Free School Zones Act had "nothing to do with `commerce.' "[8]Id. at 561, 115 S.Ct. 1624. Lopez did not overrule Wickard, but instead restricted the application of the Commerce Clause power to matters of commerce. A transaction involving the purchase or sale of an automobilesuch as the transaction in the case now before this Courtis a matter of commerce. See M.S. Dealer Serv. Corp. v. Franklin, 177 F.3d 942 (11th Cir.1999); Phelps v. Dan Tucker Auto Sales, Inc., 672 So.2d 790 (Ala.1995).

The Federal Arbitration Act
The Supreme Court of the United States held in Marine Transit Corp. v. Dreyfus, 284 U.S. 263, 52 S.Ct. 166, 76 L.Ed. 282 (1932), that the Federal Arbitration Act ("the FAA") is a constitutional exercise of Congress's power. The FAA provides:
"A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."
9 U.S.C. § 2. "The [FAA] preempts contrary state law (specifically, contrary law based on Ala.Code 1975, § 8-1-41(3),[[9]] and public policy) and renders enforceable a written predispute arbitration agreement but only if that agreement appears in a contract evidencing a transaction that `involves' interstate commerce." Southern United Fire Ins. Co. v. Knight, 736 So.2d 582, 585-86 (Ala.1999); see Tefco Fin. Co. v. Green, supra.
The Supreme Court of the United States has broadly interpreted the term "involving *171 commerce" as being the "functional equivalent" of the phrase "affecting commerce." Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 274, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Congress's use of the phrase "affecting commerce," "normally signals Congress' intent to exercise its Commerce Clause powers to the full...." Id. at 273, 115 S.Ct. 834.
In Sisters of the Visitation v. Cochran, 775 So.2d 759 (Ala.2000), the Sisters of the Visitation contracted with an in-state contractor to renovate a chapel located in Alabama and owned by the Sisters. Pursuant to an arbitration provision in the contract, the Sisters sought arbitration of their dispute with the contractor. In my dissent in that case, I noted that the majority held that the FAA can apply to a contract only if that "individual transaction `substantially affect[s]' interstate commerce."[10] 775 So.2d at 782. Since the decision in Sisters of the Visitation in March 2000, this Court has routinely denied a party the right to arbitration where that party failed to prove that the individual transaction substantially affected interstate commerce. See Aronov Realty Brokerage, Inc. v. Morris, 838 So.2d 348 (Ala. 2002) (denying arbitration in an action brought by a purchaser of a condominium unit against a real estate brokerage, real estate agent, and condominium association); Liberty Nat'l Life Ins. Co. v. Douglas, 826 So.2d 806 (Ala.2002) (refusing to compel arbitration where an employee of an insurance company sued her employer); Ex parte Kampis, 826 So.2d 819 (Ala.2002) (denying arbitration in an action brought by a home purchaser against a contractor); Alternative Fin. Solutions, LLC v. Colburn, 821 So.2d 981 (Ala.2001) (denying arbitration where borrowers brought an action against lenders challenging the legality of certain loans); Ex parte Learakos, 826 So.2d 782 (Ala.2001)(denying arbitration in an action brought by a home purchaser against a real estate company and its agents).
The Supreme Court of the United States stated in Lopez that in order for a federal statute that regulates commercial transactions to be a valid exercise of Congress's Commerce Clause power, the aggregate nationwide participation in that activity not the individual transaction in isolation must "substantially affect" interstate commerce. Lopez, 514 U.S. at 556-57, 115 S.Ct. 1624. This "substantial-effect" testused to determine the constitutionality of a statute under the Commerce Clausewas not a new standard created in Lopez, but has been the test of a statute's constitutionality since the early twentieth century. Id. at 555-57.
Once it has been determined that Congress acted within its Commerce Clause *172 power in enacting a statute, whether that statute reaches certain activities does not depend on whether that individual act, when considered separately from all similar acts, has a substantial effect on commerce. As Wickard made clear, Filburn's "trivial" wheat production could be reached by the Agricultural Adjustment Act. The standard established by the Supreme Court of the United States is that "`where a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence.'" Lopez, 514 U.S. at 558, 115 S.Ct. 1624 (quoting Maryland v. Wirtz, 392 U.S. 183, 197 n. 27, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968)).
The standard for the application of the FAA to an individual contract was made clear to us in Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 267, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The FAA provides in pertinent part that "a contract evidencing a transaction involving commerce... shall be valid...." 9 U.S.C. § 2 (emphasis added). The Supreme Court of the United States held in Allied-Bruce Terminix that the requirement in the FAA that an individual contract involve interstate commerce should be read in the broadest possible terms because the word "involving" signals "an intent to exercise Congress' commerce power to the full." 513 U.S. at 277, 115 S.Ct. 834. The Court also stated that to be subject to the FAA a contract did not have to evidence a transaction that was "`substantially' interstate." Id. at 269, 115 S.Ct. 834.
Thus, I believe this Court erred when it held in Sisters of the Visitation that a particular contract, in order to be enforceable under the FAA must, by itself, have a substantial effect on interstate commerce, and this Court errs again today by applying the Sisters of the Visitation standard to this case.
The argument in the main opinion that Jackson's cash purchase of the car in Alabama does not affect interstate commerce is not persuasive because this Court should not examine only the individual transaction; Filburn's wheat was grown and consumed entirely intrastate. This Court should consider aggregate nationwide participation in the activity at issue. The record, in this case, reflects that McConnell is in the business of selling cars to customers who reside within and outside this state.[11] McConnell has also financed cars for customers with companies whose principal places of business are outside of Alabama. (McConnell's Brief at 8.) McConnell's sale of the car to Jackson is a part of its business of purchasing and selling cars to people inside and outside of Alabama; thus, while this individual transaction may have been local, the aggregate nationwide participation was not.
McConnell has shown a substantial effect on interstate commerce. Although it is undisputed that Jackson is an Alabama resident, that McConnell Automotive Corporation is an Alabama corporation, and that the purchase of the car occurred entirely within Alabama, McConnell has presented "`some evidence which tends to establish its claim,'" Jim Burke Auto., Inc. v. Beavers, 674 So.2d at 1265 (opinion on application for rehearing) (quoting In re American Freight Sys., Inc., 164 B.R. 341, 345 (D.Kan.1994)). The affidavits presented by McConnell indicate that these transactions were "part of a pattern of economic activities that in the aggregate *173 affected interstate commerce." Tefco, 793 So.2d at 760. The pattern demonstrated by McConnell is that it sells cars to, and finances those purchases for, out-of-state residents. Therefore, McConnell's agreement to arbitrate is properly reached by the FAA, and Jackson's claim should have been submitted to arbitration.

Conclusion
For the foregoing reasons, I dissent.
NOTES
[1] In their complaint, Robert Jackson and Kisha Jackson also alleged that the defendants had fraudulently induced them to execute the arbitration agreement that is the subject of this appeal. The defendants, in a footnote in their brief on appeal, state:

"It is the Defendants' position that Robert Jackson should not be a Plaintiff in this case. The sole purchaser of the subject vehicle was Kisha Jackson. All documents where signed only by Kisha Jackson. Therefore, whether or not Robert Jackson signed the Arbitration Agreement is not an issue on this appeal, and not a basis for the Court's denial of the Defendant's Motion to Dismiss or, Alternatively, Motion to Compel Arbitration."
(Defendants' brief, p. 1.) In their brief on appeal, the Jacksons do not respond to the footnote, and we note that only Kisha Jackson signed the documents that are the subject of this appeal. In fact, the Jacksons' counsel, in their brief, states that "[o]n or about March 8, 2001, Kisha Jackson purchased a 1999 Cadillac DeVille from McConnell ... [and] paid the full purchase price in cash." (Jacksons' brief, p. 4.) In the statement of facts, the Jacksons' counsel refers only to what Kisha Jackson did, except for one instance where he states that "Kisha Jackson's husband, Robert Jackson, asked whether Kisha Jackson had been asked to execute an `Arbitration Agreement' because the vehicle had been wrecked." (Jacksons' brief, p. 5.)
[2] See note 1.
[3] Effective October 1, 2001, Rule 4(d), Ala. R.App. P., provides: "An order granting or denying a motion to compel arbitration is appealable as a matter of right, and any appeal from such an order must be taken within 42 days (6 weeks) of the date of the entry of the order, or within the time allowed by an extension pursuant to Rule 77(d), Ala. R. Civ. P."
[4] In NLRB v. Jones & Laughlin Steel Corp., the National Labor Relations Act was challenged in its entirety as an attempt to regulate not only commerce but all industry; however, the Court addressed only the actions that burdened or obstructed commerce.
[5] Filburn had challenged the constitutionality of the Agricultural Adjustment Act, which established a wheat-acreage allotment of 11.1 acres and a normal yield of 20.1 bushels of wheat per acre. Wickard, 317 U.S. at 114, 63 S.Ct. 82.
[6] The main opinion distinguishes this case from McGrue. In McGrue, this Court applied Sisters of the Visitation v. Cochran, 775 So.2d 759, 764 (Ala.2000), in which a majority of this Court, interpreting Wickard, stated:

"[W]e conclude that the question whether the actions of an individual, which actions standing alone would be considered `local' actions or actions with only an `indirect' influence on interstate commerce, may be considered to have a substantial influence on interstate commerce is to be determined by considering how critical the regulation of all similarly situated persons' activity is to the accomplishment of the primary purpose of a statute drawn to regulate an activity clearly having a substantial effect on interstate commerce."
Thus, in Sisters of the Visitation this Court purported to modify the United States Supreme Court's Wickard decision to exclude local or indirect effects unless those effects are sufficiently "critical" to the primary purpose of the statute. In the language recited from Wickard, the United States Supreme Court expressly rejected this kind of direct/indirect analysis; it was rejected for good reason because of the infinite malleability of the concept of directness. Wickard, 317 U.S. at 125, 63 S.Ct. 82.
[7] Justice Kennedy, concurring specially, and joined by Justice O'Connor, said that the Gun-Free School Zones Act "upsets the federal balance to a degree that renders it an unconstitutional assertion of the commerce power...." Lopez, 514 U.S. at 579, 115 S.Ct. 1624 (Kennedy, J., concurring specially).
[8] The Court noted that if the Gun-Free School Zones Act passed constitutional muster, "it is difficult to perceive of any limitation on federal power...." 514 U.S. at 564, 115 S.Ct. 1624.
[9] Alabama Code 1975, § 8-1-41(3), makes void any agreement to arbitrate future, as opposed to present, disputes.
[10] I dissented in Sisters of the Visitation, stating:

"I agree with both Chief Justice Hooper and Justice Maddox that the majority opinion incorrectly extends United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). The majority requires that an individual transaction `substantially affect' interstate commerce before it can be subject to the Federal Arbitration Act (the `FAA'). The majority also establishes a higher standard of `substantial effect' than is permitted under existing United States Supreme Court precedent. See Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The United States Supreme Court has held that in the FAA Congress exercised the full scope of its Commerce Clause power. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). Until the United States Supreme Court overrules Wickard, Congress may constitutionally subject to federal jurisdiction economic activity that affects interstate commerce, as long as that effect is substantial when considered in the aggregate. I, therefore, respectfully dissent." 775 So.2d at 782.
[11] In an affidavit, Stacy Hill, the used-car manager of McConnell, stated that "McConnell Automotive Corporation, has sold motor vehicles to customers who reside out of state."